BODELL CONSTRUCTION COMPANY, a Utah corporation; James Bodell; and Michael Bodell, Plaintiffs and Appellants,

v.

STEWART TITLE GUARANTY COMPANY, a Texas corporation; Vernon F. George; First Title of Utah, Inc.; Robert Elliott; Kathryn Elliott; Floyd Helm; The Property Shoppe, Inc., a Utah corporation; Kent Sundbert; Rredco Realty; Jerald Richardson; and The Rosemont Corporation, a California corporation, Defendants and Appellee.

No. 960754–CA.

Court of Appeals of Utah.

Aug. 21, 1997.

Keith W. Meade, Salt Lake City, for Plaintiffs and Appellants.

John B. Wilson and Sean A. Monson, Salt Lake City, for Defendants and Appellee.

Before DAVIS, P.J., and BENCH and ORME, JJ.

## OPINION

DAVIS, Presiding Judge:

Plaintiffs appeal the trial court's grant of summary judgment in favor of defendant Stewart Title Guaranty Company (Stewart Title). We affirm.

## BACKGROUND

■ "Because this is an appeal from the trial court's grant of summary judgment, we review the facts in a light most favorable to the losing party." *Taylor v. American Fire & Cas. Co.*, 925 P.2d 1279, 1280 (Utah Ct. App.1996), *cert. denied*, 936 P.2d 407 (Utah 1997). We recite the facts accordingly.

### Relevant Real Estate Transactions

Vernon George and Rosemont Corporation[1] (Rosemont) entered into an agreement with Angela Drews wherein George paid $10,000 for an option to purchase the Fly–In L D Ranch (Ranch) from Drews. The option provided for a purchase price of $1.6 million. Subsequently, an addendum to the option was executed providing for a new purchase price of $1.8 million. This new price reflected a $200,000 commission to Rosemont due upon the sale of the Ranch. George paid Drews an additional $35,000 for the lease of the Ranch from April 30, 1992 through August 22, 1992, or until the option was terminated, whichever came first. The $10,000 and $35,000 were to be applied to the purchase price of the Ranch. On June 3, 1992, George assigned Rosemont's commission towards the purchase price of the Ranch.

In the spring of 1992, plaintiffs and George formed a development company called the Cedar Creek Ranch, L.L.C. (Cedar Creek) for the purpose of purchasing the Ranch and then developing and marketing individual lots. Before the sale was completed, George informed plaintiff Michael Bodell that the lowest price the Ranch could be purchased for was $1.8 million. Unknown to plaintiffs, this price included the $200,000 commission due to Rosemont.

On June 8, 1992, Cedar Creek purchased the Ranch. The closing was handled by First Title of Utah, Inc. (First Title), which issued a title insurance policy underwritten by Stewart Title. First Title, which was aware of Rosemont's commission and the inflated sales price reflecting the "commission," prepared three different settlement statements for the closing, each bearing Stewart Title's name in the bottom right-hand corner. The prepared settlement statements reflected the inflated purchase price, but only one out of the three identified Rosemont's commission. Notwithstanding the noted $1.8 million purchase price, First Title issued a title insurance policy for $1.6 million, the original purchase price for the Ranch.

Plaintiffs contributed $377,000 in cash towards the purchase of the Ranch; George deposited a cashier's check for $100,000 with First Title; Melrose Escrow, apparently another entity affiliated with George, transferred $288,000 for the purchase of the Ranch; and Rosemont's commission was credited towards the purchase in favor of George. No funds representing Rosemont's commission were ever deposited with First Title, nor were any funds disbursed by First Title with respect to the commission.

After Cedar Creek's purchase of the Ranch, Cedar Creek undertook the necessary steps to develop the land for resale of individual lots. Before this could take place, however, the parties assert that the State of Utah required that Cedar Creek establish and fund an escrow for on-site improvements

1. Rosemont Corporation was apparently a California corporation under George's control.

(the improvement escrow).[2] George was to provide the necessary capital for funding the improvement escrow, which was to be established at First Title. Thereafter, First Title was to disburse the escrow funds to third parties making improvements on the Ranch property. However, because the personal checks given by George to First Title for the improvement escrow did not clear the bank, the improvement escrow was never funded. First Title never informed plaintiffs of George's failure to fund the improvement escrow, nor was any government entity informed of the unfunded improvement escrow.

In January of 1993, plaintiffs and George formed a limited liability company for the purpose of purchasing and developing property identified as Lava Pointe. The sales agent for the Lava Pointe purchase was Rredco Realty. Rredco was undisputably entitled to a commission on the sale. For reasons that are not altogether clear, Rredco directed First Title to disburse its commission to third parties in satisfaction of some of George's debts. Stewart Title underwrote title insurance policies in connection with the Lava Pointe closing.

On July 27, 1993, First Title conducted two additional closings relevant to the instant appeal. First Title initially conducted a closing involving River Road, L.L.C.[3] (River Road) as purchaser. River Road purchased a parcel of property for $75,000, but paid only $28.36 toward the purchase price. In the second closing on the same day, River Road sold this same parcel to Clear Creek Development, L.L.C. (Clear Creek), another development company formed by plaintiffs and George, for the sum of $90,000. Plaintiffs paid approximately $75,000 toward the purchase of the parcel, and a $15,000 credit was given to Clear Creek because of an earnest money deposit George had made to River Road on July 1, 1993 for the first transaction.[4] This transaction created a "phantom equity" in the parcel for George. Stewart Title underwrote the title insurance

policies issued in connection with both of these transactions.

### Relationship Between First Title and Stewart Title

First Title is Stewart Title's agent for the limited purpose of issuing title insurance policies and commitments. An "Amendment to Title Insurance Underwriting Agreement," entered into by First Title and Stewart Title on July 1, 1984, governs First Title's authority to act as Stewart Title's agent:

In consideration of the mutual agreements expressed herein, UNDERWRITER [Stewart Title] appoints COMPANY [First Title] as its agent to execute title policies in the name of UNDERWRITER with the authority, duties, limitations and conditions set forth in this Agreement. Title policies, as the term is used in this Agreement, shall include all contracts of title insurance or guaranty, including title insurance policies, endorsements, binders and commitments.

First Title's authority to act as Stewart Title's agent was further limited by the following language: "Although COMPANY may conduct an escrow business, COMPANY shall not represent to the public that it is an agent of UNDERWRITER in the conduct of the escrow business." First Title used Stewart Title's name on its settlement statements and also its letterhead, which the parties agree declared beneath First Title's name, "Agent for Stewart Title Guaranty Company." It is undisputed that Stewart Title never had any contact with plaintiffs during any of the aforementioned transactions, nor did Stewart Title ever make any representations to plaintiffs that First Title had the authority to act as Stewart Title's agent during escrow, closing, or settlement transactions.

### Plaintiffs' Cause of Action

Plaintiffs filed the instant suit to recover damages that they suffered as a result of

---

2. Stewart Title did not underwrite a title insurance policy or commitment in connection with the improvement escrow.

3. River Road is a company allegedly under the control of George.

4. Plaintiffs claim that there is nothing in the record supporting the fact that this $15,000 was actually paid by George.

George's diversion of funds in connection with the real estate transactions. Plaintiffs claimed below that Stewart Title was liable to plaintiffs for First Title's alleged improprieties pursuant to Utah Code Ann. §§ 31A–23–305, 308 (1991). Stewart Title filed a Motion for Summary Judgment, which was granted by the trial court. Plaintiffs appeal the trial court's grant of summary judgment in favor of Stewart Title.

## ISSUES AND STANDARD OF REVIEW

Plaintiffs raise two issues on appeal: (1) Did the trial court err by determining that Stewart Title was not liable for any wrongdoing by First Title under Utah Code Ann. § 31A–23–308 (1991)? (2) Did the trial court err by failing to predicate liability either under Utah Code Ann. § 31A–23–305 (1991) or based on a common law theory of agency?

"After viewing the facts in a light most favorable to the losing party, we will affirm a grant of summary judgment 'only if there is no disputed issue of material fact and the moving party is entitled to judgment as a matter of law. We grant no deference to the trial court's conclusions of law and review them for correctness.'"

*Don Houston, M.D., Inc. v. Intermountain Health Care, Inc.,* 933 P.2d 403, 406 (Utah Ct.App.1997) (citations omitted).

## ANALYSIS

### Section 31A–23–308

Plaintiffs first argue that Stewart Title was vicariously liable under Utah Code Ann. § 31A–23–308 (1991)[5] for First Title's alleged misconduct. Plaintiffs list five instances of impropriety by First Title for which they believe Stewart Title is liable under section 31A–23–308: (1) the sale price for the purchase of the Ranch was inflated to conceal a $200,000 sales commission to George; (2) First Title issued a title policy on the Ranch for $1.6 million, as opposed to the inflated sale price of $1.8 million; (3) First Title failed to inform plaintiffs that George's check, which was intended to fund the escrow, did not clear the bank; (4) the commission for the Lava Pointe sale was not given directly to Rredco, but was instead paid to George's creditors as directed by Rredco; and (5) First Title closed a "double" escrow on the East Ridge sale, first selling the property to a company controlled by George, who then sold the property to plaintiffs at an inflated price.

In determining whether Stewart Title is liable for First Title's conduct under section 31A–23–308, "we first examine the statute's plain language." *Gull Laboratories, Inc. v. Utah State Tax Comm'n,* 936 P.2d 1082, 1084 (Utah Ct.App.1997) (citations and quotation marks omitted). Based on the plain language, we can quickly dispose of the first two instances of improprieties outlined above. Section 31A–23–308 clearly applies only to transactions involving "the receipt and disbursement of funds deposited in escrows, closings, or settlements with the title insurance agents." Utah Code Ann. § 31A–23–308 (1991). Neither of these transactions involved the "receipt and disbursement of funds deposited in escrows, closings, or settlements." Thus, Stewart Title is not liable for First Title's actions under section 31A–23–308 in these two instances.

Regarding the unfunded improvement escrow, this was not a "transaction[ ] where a commitment or binder for or policy or contract of title insurance of that title insurance company ha[d] been ordered, or a preliminary report of the title insurance company ha[d] been issued or distributed." *Id.* § 31A–23–308. Therefore, again, section 31A–23–308 is inapplicable and Stewart Title

---

5. Section 31A–23–308 of the Utah Code provides: Any title company, represented by one or more title insurance agents, is directly and primarily liable to others dealing with the title insurance agents for the receipt and disbursement of funds deposited in escrows, closings, or settlements with the title insurance agents in all those transactions where a commitment or binder for or policy or contract of title insurance of that title insurance company has been ordered, or a preliminary report of the title insurance company has been issued or distributed. This liability does not modify, mitigate, impair, or affect the contractual obligations between the title insurance agents and the title insurance company.

Utah Code Ann. § 31A–23–308 (1991).

is not liable under this section for First Title's actions, or inaction, regarding the improvement escrow.

■ Plaintiffs' last two claims are also easily disposed of. By redirecting Rredco's commissions as instructed by Rredco, First Title was simply following the instructions given. Section 31A–23–308 does not prohibit Rredco, which plaintiffs do not dispute was entitled to the commission, from directing disbursement of the commission as it saw fit. This same analysis applies to the Eastridge closings. Regardless of George's misconduct, plaintiffs have not established that First Title was doing anything more than following instructions. Accordingly, no liability, much less *vicarious* liability, is incurred under section 31A–23–308 from these two transactions.

### Section 31A–23–305/Common Law

Plaintiffs argue next that if Stewart Title is not liable under section 31A–23–308, then liability can be predicated upon Utah Code Ann. § 31A–23–305 (1991)[6] and/or common law agency principles. Plaintiffs contend that because Stewart Title acquiesced in First Title's use of Stewart Title's name on First Title's letterhead, title policies, and settlement statements, First Title had either implied or apparent authority[7] to act as Stewart Title's agent.

■ "[A]n agent's apparent . . . authority flows only from the acts and conduct of the principal." *Zions First Nat'l Bank v. Clark Clinic Corp.*, 762 P.2d 1090, 1095 (Utah 1988).

"[T]he authority of the agent [is not] 'apparent' merely because it looks so to the person with whom he deals. It is the principal who must cause third parties to believe that the agent is clothed with apparent authority.... It follows that one who deals exclusively with an agent has the responsibility to ascertain that agent's

authority despite the agent's representations."

*Id.* (quoting *City Electric v. Dean Evans Chrysler–Plymouth,* 672 P.2d 89, 90 (Utah 1983)).

■ We conclude that under the undisputed facts of this case, First Title's use of Stewart Title's name did not cloak First Title with apparent authority to act as Stewart Title's agent in escrow, settlement, or closing transactions. *Cf. id.* (citing with approval case holding " '[t]he furnishing of a rubber stamp bearing the name and address of the principal, a commonplace occurrence, did not cloak [the agent] with apparent authority to endorse corporate checks and receive payment for them' " (citation omitted)). Any appearance of authority to act as Stewart Title's agent in escrow, closing, or settlement transactions came from First Title, not Stewart Title. Thus, the requirement that the principal (Stewart Title) must conduct itself in such a way to cause the third party (plaintiffs) to believe that the agent (First Title) has apparent authority to act on behalf of the principal has not been met. Additionally, if plaintiffs really believed that First Title was acting as Stewart Title's agent for settlement, escrow, or closing transactions, then they were under an obligation to ascertain the scope of that agency. *See id.*

■ Neither did First Title have implied authority to act as Stewart Title's agent. "Implied authority is actual authority based upon the premise that whenever the performance of certain business is confided to an agent such authority carries with it by implication authority to do collateral acts which are the natural and ordinary incidents of the main act or business authorized." *Id.* at 1094–95. "Implied authority . . . embraces authority to do those acts which are incidental to, or are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent." *Id.* at 1094.

---

**6.** Section 31A–23–305 provides, in relevant part: (1) There is a rebuttable presumption that every insurer is bound by any act of its agent performed in this state that is within the scope of the agent's actual (express or implied) or apparent authority, until the insurer has canceled the agent's appointment and has made

reasonable efforts to recover from the agent its policy forms and other indicia of agency.
Utah Code Ann. § 31A–23–305 (1991).

**7.** Plaintiffs do not argue that First Title had express actual authority.

Plaintiffs argue that transactions involving escrows, closings, and settlements are necessary to issuing title insurance because they always occur simultaneously, and therefore, First Title had the implied authority to act as Stewart Title's agent while conducting these transactions. While it may very well be true that issuing title insurance typically occurs concurrently with escrow, closing, and settlement functions, this does not necessarily make them mutually inclusive, which is evidenced by the agency agreement between Stewart Title and First Title limiting the relationship to the execution and issuance of title policies. Based on the undisputed facts of this case, we conclude that the authority bestowed upon First Title by Stewart Title did not give First Title the implied authority to act as Stewart Title's agent while performing the collateral acts of escrow, settlement, and closing transactions. *See id.* at 1095.

Accordingly, because First Title had neither apparent nor implied authority to act as Stewart Title's agent in transactions involving escrows, closings, or settlements, Stewart Title cannot be held liable for any misconduct on the part of First Title under section 31A–23–305 or common law.

### CONCLUSION

None of the transactions complained of by plaintiffs fall within the scope of section 31A–23–308. No funds were received or disbursed by First Title in relation to the closings, a title insurance policy was not issued in connection with the relevant escrow, and First Title was simply following the closing instructions. Nor do we find liability predicated upon section 31A–23–305 or the common law theory of agency. Accordingly, the trial court's grant of summary judgment in favor of Stewart Title is affirmed.

BENCH and ORME, JJ., concur.