*This opinion is subject to revision before final publication in the Pacific Reporter*

**2015 UT 55**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

———————

ORLANDO MILLENIA, LC
*Appellant,*

*v.*

UNITED TITLE SERVICES OF UTAH, INC.*
*Appellees.*

———————

No. 20130190
Filed July 17, 2015

———————

Fifth District, St. George
The Honorable James L. Shumate
No. 080500762

———————

Attorneys:

J. Bryan Quesenberry, Casa Grande, AZ, for appellant

Laura S. Scott, Salt Lake City, for appellee Stewart Title
Ronald G. Russell, Royce B. Covington, Salt Lake City, for
appellee First American
Jenny T. Jones, St. George, for appellee United Title

———————

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in
which CHIEF JUSTICE DURRANT, JUSTICE PARRISH, JUDGE PEARCE,
and JUDGE HANSEN joined.

JUSTICE DURHAM, having recused herself, does not participate;
DISTRICT JUDGE ROYAL I. HANSEN sat. JUSTICE NEHRING, due to his
retirement, did not participate; COURT OF APPEALS JUDGE JOHN A.
PEARCE sat.

JUSTICE DENO G. HIMONAS became a member of the Court on Feb-
ruary 13, 2015, after oral argument in this matter, and accordingly
did not participate.

———————

* UNITED TITLE SERVICE OF SOUTHERN UTAH dba of CCD, L.C.;
PAYDIRT, LP; TODD VOWELL; JASON VOWELL; JEREMY JOHNSON;
KATTS, LLC; STEWART TITLE INSURANCE CO.; and FIRST AMERICAN
TITLE INSURANCE CO.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1 Orlando Millenia was a lender on a multi-million dollar real estate transaction. It filed this suit alleging that United Title breached its fiduciary duty as an escrow agent in the transaction at issue. And it also asserted claims for vicarious liability against Stewart Title and First American Title under Utah Code section 31A-23a-407. The district court dismissed these claims on summary judgment.

¶2 We reverse. In the circumstances of this case—in which Orlando submitted and was identified expressly on the special escrow instructions, and the instructions were incorporated in the real estate purchase contract in question—we conclude that Orlando has stated a claim for breach of fiduciary duty that survives the defendant-appellees' motions for summary judgment. We also conclude that Orlando has successfully stated a claim for vicarious liability under the statute.

¶3 In upholding Orlando's claim under section 407, we acknowledge a degree of uncertainty regarding the proper construction of some of the terms of this statute. And we likewise acknowledge the weight of the title companies' policy concerns regarding the scope of vicarious liability set forth in this provision. But we ultimately find ourselves bound by the broad terms of the statute as we understand it, and thus leave for the legislature the question (if it chooses to take it up) of whether to pare back on the standard of secondary liability set forth in Utah Code section 31A-23a-407.

I

¶4 The factual background of this case is somewhat complicated. To set the stage, we begin with an introduction of the key parties and players, as well as the two properties involved in the transaction. We then proceed to describe the specific events that gave rise to this appeal.

¶5 Orlando Millenia is the lender and plaintiff/appellant in this case. It is a small real estate investment company. It financed the down-payment for the property transaction at issue in this case, and Orlando's principals, Blaine Hofeling and David Grant, variously fulfilled Orlando's accompanying responsibilities. Ho-

feling and Grant, in addition to being principals of Orlando, are also members of Commonwealth Holdings, LC, a separate real estate investment company.

¶6 IDR Investments LLC is the buyer and Orlando's lendee. Through its principal, Ryan Gregerson, IDR participated in the closing meeting, communicated frequently with the escrow agent and the seller, and signed the real estate purchase contract (REPC). Several months after the transaction, IDR filed for bankruptcy, an event that precipitated Orlando's action against United Title.

¶7 Paydirt, LP is the seller. It owned the property and agreed to sell it to IDR after signing the REPC. Following a settlement, the parties agreed to dismiss Paydirt from this action.

¶8 United Title is the title insurance producer for Stewart Title Guaranty Company and First American Title Insurance Company. United Title issued a commitment for title insurance to IDR. It also acted as the escrow agent for this transaction.

¶9 Stewart Title is a title company. It authorized United Title to issue title insurance to IDR in Stewart Title's name. Orlando seeks to hold Stewart Title vicariously liable for United's "dealings" under Utah Code section 31A-23a-407.

¶10 First American Title is also a title company. It became involved in this suit when United Title accidentally sent an unauthorized First American commitment to IDR. That commitment from United Title was the second commitment IDR received, though IDR ordered only one.

¶11 IDR had designs to purchase two different properties. The first, the so-called Stout property, was located in Hurricane, Utah. Upon learning of the property's availability, IDR approached Orlando about providing a $1 million down payment for it. IDR intended to subdivide this property and sell the lots to individual developers.

¶12 In an effort to secure funding for the purchase of the Stout property, IDR approached an investor, Commonwealth Holdings, LC (and more specifically, its separate investment arm, Orlando Millenia) in August 2006. IDR asked Commonwealth to supply the earnest money for the Stout property. The Commonwealth

principals agreed to loan IDR the earnest money through Orlando.

¶13 Later, IDR learned of another parcel, referred to as the SITLA property, and decided to abandon its efforts to purchase the Stout property. As the shorthand name suggests, this property was owned by the School and Institutional Trust Lands Administration. Paydirt purchased the land at an auction and immediately began shopping the parcel to other buyers and ultimately agreed to sell the property to IDR for $6.4 million, including a $1 million earnest money deposit. IDR spoke with Orlando about using the $1 million earnest money (previously designated for the Stout property) to purchase the SITLA property instead.

¶14 IDR and Paydirt entered into a Real Estate Purchase Contract (REPC) on October 20. They agreed that United Title would serve as the escrow agent and that the closing would take place before November 15. Orlando agreed to extend its original loan to cover the earnest money deposit for the SITLA property transaction.

¶15 In the meantime, IDR sought a commitment for title insurance in connection with this transaction. IDR approached United Title, a title insurance producer and also the escrow agent for the upcoming transaction, for this commitment. As it happened, United Title issued two commitments to IDR, both on October 24: one from First American, and another from Stewart Title. This appears to have been an accident. Nothing in the record suggests that IDR sought two commitments. Yet it is clear that two commitments were provided.[1]

¶16 Also during the interim between the REPC and the closing, Orlando Millenia drafted Special Escrow Instructions, which conditioned the disbursement of the earnest money on Orlando's and IDR's receipt of certain documents. Specifically, these instructions required United Title to obtain and provide Orlando: (1) a land patent and/or land grant vesting title to the SITLA property, (2) a promissory note executed by Paydirt in favor of SITLA, (3) a rec-

---

[1] It is worth noting that Stewart Title, but not First American, authorized United Title to deliver a commitment, and that United Title believes that IDR received the First American commitment by accident.

ord trust deed, and (4) a warranty deed from Paydirt to Orlando. The instructions also required that Orlando review the documents. And they authorized United Title to disburse the funds only after receiving Orlando's written approval.

¶17 On October 30, IDR's Ryan Gregerson sent these instructions to United Title. The instructions were signed by both Gregerson (on behalf of IDR) and Grant (on behalf of Orlando). Grant then contacted United Title to confirm the receipt of the special instructions. Also on October 30, Commonwealth Holdings wired the $1 million in earnest money to United Title.

¶18 As noted above, the parties agreed to close the transaction no later than November 15. Yet on November 6, according to Gregerson, Paydirt demanded that the deal close "today or else." Gregerson made his way to United Title, but, at least according to Orlando, neither of Orlando's principals attended because Gregerson failed to tell them that his reason for going to United Title's office was to participate in the closing. That said, while en route, Hofeling did tell Gregerson "to protect his interest" and that he "should be fine" at the meeting because "[t]he title company has to follow escrow instructions."

¶19 Thus, when the closing occurred, the only significant players in attendance were Gregerson, Paydirt's principals, and United Title's agent. The Special Escrow Instructions were never mentioned during the closing meeting, though the parties did have copies of them. What Gregerson did attempt to make clear, however, was that IDR must receive a warranty deed (required by the REPC, not the special instructions) in connection with the sale. United Title assured him that he would receive the warranty deed, but that it would take a couple of weeks for the state to process all the required paperwork. With that understanding, Gregerson signed the closing documents.

¶20 Following the closing, Gregerson felt "very pleased." He also felt a bit confused, due to the length and complexity of the closing documents he had just signed. Orlando's principals met with Gregerson ten to fourteen days later (between November 16 and 20). At that meeting, Orlando became troubled by what had transpired at the closing. Gregerson admitted that he had signed "a bunch of documents that he'd never seen before." And Orlando learned that a warranty deed had not yet been issued and, as-

suming the money had already been disbursed (which it had not), felt that "something very strange had taken place."

¶21 Despite these troubling revelations about the closing, neither Orlando nor IDR attempted to prevent United Title from releasing the earnest money. And, on November 20, United Title did just that. Paydirt deposited the funds that same day. The funds then became available one to three business days later. It was not until late February 2007 that Orlando contacted United Title with concerns about the closing.

¶22 That's where things stood until sometime after November 20. At that point Orlando contacted SITLA's office to clear up some of the confusion surrounding the closing. It was then that Orlando learned that SITLA still owned the property and that Paydirt would not receive title until it could pay off what it owed SITLA for the property. This meant that Paydirt did not have title to the property and that Orlando's trust deed (for the earnest money loan) therefore could not be recorded against it. Further confirming its fears, Orlando received a title report on the SITLA property in December showing that SITLA still held title to the property. Orlando and IDR met daily over the ensuing weeks to determine what had happened and how the problem might be solved. They developed a plan to obtain financing to pay off Paydirt, which would in turn pay off SITLA, and set off a chain of events ultimately vesting title in IDR.

¶23 That plan failed. On February 23, Orlando finally relayed its concerns to United Title. At that point United Title's agent asserted that he had "done nothing wrong" and had "completed the transaction as requested by all parties, including Orlando." Four days later, Orlando sent demand letters to United Title, demanding the return of the $1 million earnest money deposit and resolution of IDR's inability to obtain title in the SITLA property. IDR declared bankruptcy shortly thereafter, in February 2008, listing the Orlando loan as among its debts. Orlando filed this action in district court the following month.

¶24 Orlando's complaint asserted a claim for breach of fiduciary duty against United Title, alleging that United Title had an obligation to disburse the escrowed funds only after the terms of Orlando's special escrow instructions had been fulfilled. In addition, Orlando sought to hold Stewart Title and First American Ti-

tle vicariously liable for United Title's breach. In support of this claim, Orlando cited Utah Code section 31A-23a-407 (2003), which provides that a "title company, represented by one or more title insurance producers, is directly and primarily liable to others dealing with the title insurance producers for the receipt and disbursement of funds deposited in escrows with the title insurance producers in all those transactions where a commitment or binder for or policy or contract of title insurance of that title insurance company has been ordered."

¶25 Following discovery, three summary judgment motions were filed. Stewart Title moved for summary judgment on several grounds: (a) that Stewart Title was not vicariously liable for United Title's actions as escrow agent under Utah Code section 31A-23a-407; (b) that Orlando's claims that United Title breached its fiduciary duty or was unjustly enriched fail as a matter of law; (c) that Orlando did not suffer damages; and (d) that Orlando failed to mitigate its alleged damages.

¶26 First American also moved for summary judgment on two grounds, both related to the title insurance commitment Orlando received from United Title. First, it argued that the commitment was never "issued" or "distributed" to Orlando because there was never any intent for Orlando to obtain the commitment. And second, it asserted that United Title did not have any authority—actual, apparent, or implied—to issue the commitment, so First American could not be held liable under section 407.

¶27 Orlando moved for summary judgment (in part) as well. In its motion, Orlando asked the district court to conclude that section 407 imputes liability to both Stewart Title and First American.

¶28 The district court granted Stewart Title's and First American's motions and denied Orlando's. It neither issued a written opinion nor gave any other explanation for its decision. Orlando filed this appeal. We review the district court's summary judgment ruling de novo. *Bahr v. Imus*, 2011 UT 19, ¶ 16, 250 P.3d 56.

II

¶29 Orlando's claims in this action are twofold: (a) claims for primary liability arising out of United Title's alleged breach of fiduciary duty; and (b) claims for vicarious liability under Utah Code section 31A-23a-407—a provision that Orlando views as im-

posing vicarious liability on Stewart and First American for United Title's actions as escrow agent in the SITLA property transaction. The defendant title companies challenge the viability of Orlando's claims at every turn. They contend, first, that the fiduciary duty claim fails as a matter of law on each of the elements of such a claim. And they also contest the basis for imposing vicarious liability under Utah Code section 31A-23a-407, identifying a range of roadblocks to their statutory liability under various provisions of the statute as they interpret them.

¶30 We reverse. First, we conclude that Orlando has asserted a viable claim for primary liability as to United Title arising from its alleged breach of fiduciary duty. We uphold that claim against the title companies' motions for summary judgment, concluding that there are, at a minimum, genuine issues of material fact on each of the elements of this claim. Second, we conclude that Orlando has asserted a successful claim for vicarious liability against Stewart Title and First American Title under Utah Code section 31A-23a-407 as we interpret its terms. On this claim, we interpret the terms of the statute in a manner consistent with Orlando's claim[2] and hold that Orlando is entitled to judgment as a matter of law.[3]

## A. Primary Liability (Fiduciary Duty Claim)

¶31 Orlando's threshold claim is for breach of fiduciary duty. It alleges that United Title breached such a duty in its failure to follow the special escrow instructions. In advancing their motions

---

[2] For reasons noted below, our determination of the title companies' statutory liability is contingent on Orlando's success in pursuing the primary fiduciary duty claim to a favorable judgment. *See Old Standard Life Ins. Co. in Rehab. v. Duckhunt Family Ltd. P'ship*, No. 2:05-CV-00536, 2006 WL 3716110, at *9 (D. Dec. 14, Utah 2006) (explaining that section 407 "must not hold the title company liable for acts for which the producer could not be independently liable").

[3] There is one other claim mentioned in passing in Orlando's briefing (and in its summary judgment motion below)—its claim for conversion. Yet the briefing on this claim—both on appeal and in the district court—is inadequate. Orlando's briefing on this issue fails to cite any authority and makes no attempt to connect the law to the facts of this case. And no other brief mentions the claim. The district court's decision dismissing this claim accordingly stands.

for summary judgment, United, Stewart, and First American all challenge this claim on each of its component elements—breach, causation, duty, and damages.[4] We reject each argument for reasons that follow.

### 1. Duty of escrow agent to nonparty lender

¶32 The first question is one of duty—whether an escrow agent owes a duty to lenders who are not formal parties to the escrow transaction but who are identified as intended beneficiaries who will be submitting escrow instructions. United points to Utah precedent suggesting that an escrow agent owes a fiduciary duty to "both parties to the transaction." *Freegard v. First W. Nat'l Bank*, 738 P.2d 614, 616 (Utah 1987). And it asks us to embrace a negative implication of the *Freegard* premise—in holding that there is no duty to a nonparty lender.

¶33 We do not read the *Freegard* opinion to have resolved that question. The question of extending the fiduciary duty to a nonparty lender was not presented in *Freegard* or in any other Utah case that we have found. So the question is a matter of first impression. And it is one we must consider as a matter of first principles, and not by foreclosing a duty just because our cases have not previously recognized one.

¶34 Fiduciary duties are implicated by certain special relationships. *See Hal Taylor Assocs. v. Unionamerica, Inc.*, 657 P.2d 743, 749 (Utah 1982). A "fiduciary relationship" exists between two parties when one of them "is required to act for the benefit of [the other] on all matters within the scope of their relationship." BLACK'S LAW DICTIONARY 702 (9th ed. 2009) (defining fiduciary). Because, for instance, attorneys are required to represent their clients' interests diligently, they are considered fiduciaries of their clients. The same goes for a principal's agent, who is required to act solely for the benefit of the principal in matters connected with the agency. *See* RESTATEMENT (SECOND) OF AGENCY §§ 13, 387 (1958).

---

[4] The lead brief on appeal on these points is Stewart Title's. United Title and First American Title both filed briefs joining in the arguments advanced by Stewart. For the sake of brevity and clarity, however, we refer to the arguments below as United's, as the question goes initially to an alleged breach on the part of United.

¶35 Escrow agents are often considered fiduciaries, too, and most commonly as to the parties to the escrow agreement. This makes sense because the relationship between them is similar to those relationships mentioned above. Thus, while we have long held that an escrow agent "assumes the role of the agent of both parties to the transaction," *Freegard*, 738 P.2d at 616, this appears to be rooted in the nature of this relationship. By agreement, the escrow agent is required to perform essential functions on behalf of the parties, like receiving and disbursing funds. The agent's mishandling of those funds, then, can give rise to a claim for breach of fiduciary duty. *Id.*

¶36 The question presented here is whether that same duty extends to a third-party beneficiary of the escrow agreement. An escrow agent has no duty to a nonparty with a mere incidental interest in the escrow transaction. *See Markowitz v. Fid. Nat'l Title Co.*, 48 Cal. Rptr. 3d 217, 229–30 (Cal. Ct. App. 2006). But that does not answer the question whether the duty might extend to Orlando, whose connection to the transaction is much closer.

¶37 In contract law, a third party has standing to sue if it is an *intended*, and not merely an *incidental*, beneficiary. *Ron Case Roofing & Asphalt Paving v. Blomquist*, 773 P.2d 1382, 1386 (Utah 1989). The distinction between *intended* and *incidental* beneficiaries to a contract is especially significant here. For reasons explained below, Orlando was such a third-party beneficiary. And as such it is also a party to the fiduciary relationship established by the escrow contract. *See Markowitz*, 48 Cal. Rptr. 3d at 230–31; *Blank v. Baronowski*, 959 F. Supp. 172, 177 (S.D.N.Y. 1997) (stating that tort liability "may be predicated upon the precise conduct which also consistutes a breach of contractual obligations" (internal quotation marks omitted)).

¶38 Orlando is expressly named in the special escrow instructions. The instructions are headed with the byline "From: IDR Investments and Orlando Millenia." And Orlando's name is mentioned eight times throughout, with the instructions requiring specific actions from Orlando before United Title may disburse the funds to Paydirt. The parties' actions confirm Orlando's central role in the escrow process. After Gregerson faxed the instructions, Orlando called United Title's office directly to confirm receipt.

¶39 The REPC, moreover, required United Title to follow these instructions, which are incorporated therein by reference. Clause 3 of that contract provides that settlement may occur only after the "Buyer and Seller have signed and delivered to each other or to the escrow/closing office all documents required by this Contract, by the Lendor, by written escrow instructions or by applicable law." The reference to "the Lendor" is at least arguably a nod to Orlando. And for present purposes we deem it as such, given that Orlando gets the benefit of reasonable inferences as the nonmoving party on summary judgment.

¶40 In these circumstances, Orlando is no mere incidental beneficiary of United's escrow services. It is for all practical purposes a party to the escrow agreement with United Title. It is at least an *intended* third-party beneficiary (and one expressly identified by the parties). And in that capacity it is entitled to the fiduciary duties that run to those formal parties to the underlying contract. *See Markowitz*, 48 Cal. Rptr. 3d at 230–31.[5]

---

[5] Our analysis here proceeds on the premise that United Title's duties to Orlando are defined by the law of fiduciary duty. That premise is consistent with our past cases. *See Freegard v. First W. Nat'l Bank*, 738 P.2d 614, 616 (Utah 1987); *New Fed. Sav. & Loan Ass'n v. Guardian Title Co. of Utah*, 818 P.2d 585 (Utah Ct. App. 1991); *see also Tucson Title Ins. Co. v. D'Ascoli*, 383 P.2d 119, 121–22 (Ariz. 1963); *Money Store Inv. Corp. v. S. Cal. Bank*, 120 Cal. Rptr. 2d 58, 62–64 (Cal. Ct. App. 2002); *Logan v. Chicago Title Ins. Co.*, B238348, 2013 WL 1080300, at *3 (Cal. Ct. App., Mar. 15, 2013). Yet of course an escrow agent's duties may also be defined by contract. And at least in some jurisdictions, a duty defined explicitly by contract is enforceable only in contract, and may not be supplemented by a claim for breach of fiduciary duty. *See Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 767 F. Supp. 1220, 1231 (S.D.N.Y. 1991) *rev'd on other grounds,* 967 F.2d 742 (2d Cir. 1992); *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 196 (S.D.N.Y. 2011); *Guthrie Clinic, Ltd. v. Travelers Indem. Co. of Ill.*, No. 3:00 CV 1173, 2000 WL 1853044, at *3 (M.D. Pa. Dec. 18, 2000); *Gale v. Bershad*, No. Civ. A. 15714, 1998 WL 118022, at *5 (Del. Ch. 1998). We do not reach this question here, however, as the issue has not been raised by the parties.

### 2. Breach

¶41  United's duty can sustain a claim by Orlando only if there was also a breach. Orlando insists that there was a breach, noting that it is undisputed that United failed to send the documents listed in the instructions, and that Orlando did not "fully review[] the documents . . . and give written approval" for disbursement. Yet United claims that IDR waived the instructions at the closing, eliminating any responsibility that United had to follow them. We disagree.

¶42  Even if IDR consented to waiver of the instructions at the closing (a question of fact we need not decide), Orlando never gave its consent. That is fatal to United's argument. IDR was not Orlando's agent. And United could not reasonably have believed it was.

¶43  Escrow instructions are not subject to unilateral waiver.[6] So given the absence of any actual or apparent agency relationship between Orlando and IDR, and in light of the fact that both Orlando and IDR signed the escrow instructions, IDR could not legally waive United's obligations without first obtaining Orlando's permission. Without such waiver, moreover, there is at least a genuine issue as to whether United Title breached its duty to Orlando by failing to follow the escrow instructions.

### 3. Proximate Causation

¶44  That leads to the question of causation. United Title seeks summary judgment on the ground that Orlando has failed to demonstrate that its damages were proximately caused by United's breach. United advances two separate grounds for this conclusion. First, it contends that Orlando cannot prevail unless it can show that "but for United Title's [breach], IDR would have repaid Orlando," a burden Orlando cannot meet. Second, it asserts that Orlando failed, as a matter of law, to take reasonable steps to

---

[6] *See Westamerica Bank v. City of Berkeley*, 133 Cal. Rptr. 3d 883, 893 (Cal. Ct. App. 2011) ("[A] unilateral change in the terms of the escrow agreement . . . is not permitted . . . ."); *Jones v. Title Guar. & Trust Co.*, 173 P. 586, 587–588 (Cal. 1918) (holding that the escrow agreement could not be changed by another party when one of the original parties who signed and submitted the first instructions was not present for the change and did not know about it).

avoid its damages. We disagree, as issues of material fact remain rendering summary judgment inappropriate.

¶45 On the first argument, United misstates the governing standard of proximate cause. The special escrow instructions conditioned disbursement on the receipt of documents providing Orlando certain assurances about title. The causation question, then, is not whether IDR would have repaid Orlando if the instructions had been followed; it is whether United's failure to provide the required assurances caused harm to Orlando. And material facts remain in dispute on this question. Perhaps it is conceivable that Orlando would have approved the disbursement despite not receiving the title documents, on the basis of a belief that the title documents would be forthcoming. Yet a simple title search, which Orlando ultimately performed on its own at a later date, would have revealed a fundamental title problem—that Paydirt did not hold title to the SITLA property and thus could never have provided the documents required in the escrow instructions. Accordingly, there is a genuine dispute foreclosing summary judgment.

¶46 United's second point, about Orlando's failure to avoid damages, is a closer call. According to United, Orlando had, at the very least, six days between the time it knew the transaction had to be settled (November 15) and the day the funds became available to Paydirt (November 21) to place a simple phone call to United Title. Not having received any of the required documents, but knowing the deal had closed, Orlando knew "something very strange had taken place." And in these circumstances, United claims that Orlando abdicated its duty to mitigate by unreasonably failing to halt the transaction, especially given how easily it could have done so.

¶47 Yet this argument also fails in the factual circumstances of this case, as viewed through the prism of the doctrine of mitigation. Under the doctrine of mitigation, injured parties may not recover if the "damage arising from the wrongful conduct . . . could have been avoided or minimized by reasonable means." *Angelos v. First Interstate Bank of Utah*, 671 P.2d 772, 777 (Utah 1983). Significantly, however, this duty to mitigate is implicated only when the injured party "has knowledge" that "some damage has occurred." *Smith v. U.S. Fid. & Guar. Co.*, 949 P.2d 337, 345 (Utah 1997).

¶48 On this record, genuine issues of material fact foreclose our ability to sustain summary judgment under this standard. The matter of a party's "reasonable means" of mitigating is fact-intensive and context-dependent. And on this record there is evidence that could sustain a reasonable determination that Orlando performed reasonably.

¶49 Orlando's mitigation window was short, between two and six days. Though the deal actually closed November 6, Orlando did not learn about the problems that took place at the closing until ten to fourteen days later (November 16–20). In that timeframe, it is true that Orlando failed to contact United Title to halt the deal. But Orlando did not do nothing. It began working with IDR in pursuit of other means to preserve the deal, such as locating other investors to cover the purchase price of the property. After learning what transpired at the closing, moreover, Orlando made two assumptions, both of which could provide some justification for the decision not to call United Title. Orlando assumed (1) that United had already disbursed the earnest money, and (2) that the title documents were currently being processed by the state and would be forthcoming (as promised by United). The first assumption may be justified by the fact that the closing had taken place ten to fourteen days earlier, and there was no agreed upon date for releasing the money. The second assumption was also arguably justified, since United assured Gregerson that the warranty deed would take time to process.

¶50 These assumptions could render reasonable Orlando's decision to attempt mitigation through other means. And Orlando, as the nonmoving party on summary judgment, is entitled to the benefit of the doubt on these matters. We reject United's argument on that basis.

### 4. Damages

¶51 That leaves the final element of damages. In United Title's view, it was Commonwealth Holdings, and not Orlando, that suffered harm resulting from United's breach. It was Commonwealth, after all, that wired the $1 million to United Title. So United says that Orlando has not been harmed, but instead stands to gain a $1 million windfall if it prevails.

¶52 We reject this argument in the face of disputed questions of fact in the record. United Title's argument ignores the nature of

the relationship between Orlando and Commonwealth. Under Orlando's version of the facts, Orlando, not Commonwealth, owned the rights to the $1 million IDR loan. At the time the loan was made, Commonwealth owned the loan, and Orlando was Commonwealth's subsidiary. But later, due to strategic differences surrounding the development of one of its properties, the Commonwealth principals decided to part ways. And in an effort to part ways amicably, they agreed to divide assets, with Hofeling and Grant taking over Orlando and the IDR loan. From that point forward, Orlando held the rights to the IDR loan and thus, under this version of the facts, Orlando, not Commonwealth, suffered $1 million in damages.

### B. Vicarious Liability under Section 407

¶53 Orlando's secondary claims seek to impose vicarious liability on Stewart Title and First American Title. The basis for such liability is statutory—Utah Code section 31A-23a-407. That provision outlines the conditions under which a title company may be secondarily liable[7] for a title insurance producer's conduct:

> Any title company, represented by one or more title insurance producers, is directly and primarily liable to others dealing with the title insurance producers for the receipt and disbursement of funds deposited in escrows with the title insurance producers in all those transactions where a commitment or binder for or policy or contract of title insurance of that title insurance company has been ordered, or a preliminary report of the title insurance company has been issued or distributed. This liability does not modify,

---

[7] The statute uses the terminology of "direct[]" and "primar[y]" liability. UTAH CODE § 31A-23a-407. Yet we characterize it as imposing *vicarious* or *secondary* liability because that is its apparent impact, and because the parties in this case and others have conceptualized it in this way. *See Old Standard Life Ins. Co.*, 2006 WL 3716110, at *11 (denying a summary judgment motion because disputed facts remain as to whether the title company "may be vicariously liable" under this same statute); *Bodell Constr. Co. v. Stewart Title Guar. Co.*, 945 P.2d 119, 123 (Utah Ct. App. 1997) (holding title company was not "vicariously liable" under this statute).

> mitigate, impair, or affect the contractual obligations between the title insurance producers and the title insurance company.

UTAH CODE § 31A-23a-407 (2003).

¶54  This provision is hardly a model of clarity. Its broad terms implicate a series of questions regarding the breadth of its coverage. And of course counsel for each of the parties seize on those questions to advance competing arguments as to the statute's applicability to this case.

¶55  At the outset, we acknowledge a degree of uncertainty on the various problems of statutory interpretation presented. This is not one of those cases where we may retreat quickly to our deference to the statute's "plain language," as we find little here that is *plain*.

¶56  In so noting, we intend no offense to the legislative branch of government. Lawmaking is complex and cumbersome. It is the product of give and take among competing interest groups and opposing political parties. And our human language is inherently imprecise. For all these reasons our statutes are destined for occasional ambiguity—and hence for the need of judicial interpretation.

¶57  Yet the difficulty of the interpretive task is no justification for standing down. Judges don't get to declare ties. We must resolve questions of statutory interpretation—even hard ones—that come before us. So we proceed to do our best to resolve the interpretive questions raised by the parties—while acknowledging, of course, the prerogative of the legislature to step back into this dialogue (by amending the statute) if it deems it appropriate to do so.

¶58  Stewart Title presents a litany of barriers to the imposition of statutory liability in this case. First American endorses those same grounds and also offers an additional argument of its own. We reject each argument in turn, concluding that the title companies' limiting constructions fail on their merits and that Orlando is entitled to judgment as a matter of law.[8] Specifically, we conclude

---

[8] Orlando's right to judgment, as noted above, is contingent on its ultimate success on the primary claim for breach of fiduciary duty. The title companies' statutory liability, after all, is vicari-

that (1) Orlando was an "other[] dealing with" the title companies; (2) the dealing was "for the receipt and disbursement of funds deposited in escrows"; (3) this transaction was one "where a commitment . . . has been ordered." Next, on a matter raised only by First American, we conclude that it has not established a basis for avoiding its statutory liability on the ground that it was not involved in a transaction in which "a preliminary report of the title insurance company has been issued or distributed." And finally, we also reject the title companies' request that we give section 407 a limiting construction under the doctrine of constitutional avoidance.

### 1. "Dealing with" the title insurance producer

¶59 The first ground raised by the title companies for questioning their statutory liability is in the clause that extends liability only as to "others *dealing* with" the title insurance producer. *Id.* (emphasis added). In the title companies' view, this clause is not implicated here because Orlando did not "deal with" United Title as a formal party to a real estate transaction. As with the *duty* argument above, *supra* ¶ 32, the title companies claim that Orlando was an outsider to the escrow transaction at issue, and thus contend that there was no "dealing" sufficient to sustain liability under the statute.

¶60 That position might be viable if we construed the statute to use "dealing with" in a specialized legal sense. In legal parlance, *dealing* is sometimes understood as "transacting business." *See* BLACK'S LAW DICTIONARY 457 (defining the verb "deal" as "to transact business with").[9] And there is a sense in which the rele-

_____

ous—and thus dependent on the establishment of some primary liability arising from United Title's actions in managing the receipt and disbursement of escrow funds. Thus, we agree with the federal district court's analysis in *Old Std. Life Ins. Co. in Rehabilitation v. Duckhunt Family Ltd. P'ship*, 2006 WL 3716110 (D. Utah 2006): "Although the statute does not directly hinge the title company's liability on a showing of liability by the title insurance producer, it can be read no other way. To avoid absurdity, the statute must not hold the title company liable for acts for which the producer could not be independently liable."

[9] We say that position "might be viable" because, as discussed above, there is a sense in which Orlando *did* transact business

vant transaction—the purchase of title insurance through United Title—did not involve Orlando. The title commitment in question was ordered not by Orlando but by IDR, and on that ground it could arguably be said that Orlando was not "dealing with" United in this case.

¶61 There is another sense of "dealing with," however—the *ordinary* sense of this term. That sense is broad. It encompasses any *interaction* with the title insurance producer. *See* WEBSTER'S THIRD INT'L DICT. 581 (3d ed. 2002) (defining the verb "deal" as "to act toward a person or regarding a thing").

¶62 We construe the statute to embrace this ordinary sense of "dealing with." That conclusion follows first from the terms and context of the statute. Nothing in section 407 or in its surrounding provisions suggests the use of legalese. "Dealing with" has no obvious connection to legal parlance. Phrases like "course of dealing" or "dealing at arm's length" might invoke a sense of legalese. But on its own, "dealing" smacks of ordinary language.

¶63 Second, "dealing" has no "universal" meaning within the common law or other legislation. *See Moskal v. United States*, 498 U.S. 103, 115 (1990). Instead this is a term that takes on a range of different meanings in our law. In other parts of Title 31A of the Utah code, for example, "dealing" takes on a broad range of meanings—including the colloquial sense of *interacting* with.[10]

---

with United Title—in that it submitted escrow instructions to United and United agreed to fulfill those instructions as a precondition to closing. *See supra* ¶¶ 16–18.

[10] *See* UTAH CODE § 31A-25-205 (permitting "any person dealing with [third party administrators]" to require insurance coverage above statutory minimums); *id.* § 31A-40-102(15)(d)(i) (defining a "qualified actuary" as one who has not "violated a provision of . . . statute or other law in the course of the actuary's dealings"); *id.* § 31A-14-101(3) (stating that one purpose of chapter 14 is to "provide Utah policyholders dealing with foreign insurers with regulatory protection"); *id.* § 31A-15-103(6)(c) (stating that "[t]he commissioner may prohibit . . . all insurance producers from dealing with the insurer" under certain circumstances); *id.* § 31A-17-404(2)(d) ("A domestic ceding insurer is allowed credit for reinsurance . . . only if the reinsurance contract contains a provision placing on the reinsurer the credit risk of all dealings with inter-

That is a significant barrier to an interpretation of section 407 that would import a specialized legal sense of "dealing with." If there is no uniform legal sense of the term, we cannot appropriately incorporate it into the statute.

¶64 We accordingly construe section 407 to use "dealing with" in the ordinary sense of interacting with. And we conclude that Orlando has established that it was "dealing with" United Title in this sense.

¶65 Orlando and United Title had two principal interactions: on the special escrow instructions and in connection with the earnest money wire transfer. The byline of the instructions notes that they are "[f]rom" both IDR and Orlando, and the instructions contain numerous references to Orlando's anticipated involvement in approving the disbursement to Paydirt. Most significantly, the instructions were signed by David Grant, an Orlando principal, on a signature block expressly designated for Orlando. After Gregerson sent the instructions to IDR, Grant called United Title's office to confirm that they had been received.

¶66 Stewart Title notes that the instructions were faxed by IDR, not Orlando. And it insists that Orlando's role in drafting the instructions did not rise to the level of "dealings." Perhaps it's true that behind-the-scenes drafting would not amount to "dealing." But Orlando did more than that. The instructions expressly noted Orlando's anticipated role in the disbursement of the earnest money. And Orlando's signature was specifically indicated. Those elements would have signaled to United that it was "dealing with" Orlando. As noted above, the instructions required Orlando's written approval prior to any disbursement, so United Title could not avoid Orlando and complete the transaction without breaching the instructions.

¶67 The title companies contend that the earnest money came from Commonwealth Holdings and not Orlando. Orlando cites contrary evidence, suggesting that United knew that Orlando was ultimately the lender. We need not resolve that controversy here,

---

mediaries regarding the insurance contract."); *id.* § 31A-37a-205(9)(c)(ii) ("[T]he receiver shall deal with the asset or liability in accordance with the terms of a relevant governing instrument or contract.").

however, as there is sufficient evidence that United was "dealing with" Orlando in connection with the escrow instructions. That evidence defeats the title companies' motions for summary judgment and sustains judgment in Orlando's favor regardless of whether Commonwealth or Orlando was viewed as the lender.

### 2. For the "receipt and disbursement of funds"

¶68 The second basis for the title companies' motions for summary judgment arises out of a further qualification on the statutory principle of vicarious liability. Under section 407, title companies are not liable for *all* of an insurance producer's "dealings." They are liable as to dealings "*for* the receipt and disbursement of funds deposited in escrows." UTAH CODE § 31A-23a-407 (emphasis added).

¶69 This clause confines a title company's vicarious liability to the title insurance producer's handling of escrowed funds. And each of Orlando's above-mentioned dealings with United Title seems to meet this qualification. Orlando, through Commonwealth Holdings, wired $1 million to United Title (for its receipt) and provided escrow instructions (governing disbursement). And in the interim between that receipt and disbursement, United Title placed these funds in escrow.

¶70 The title companies' attempts to avoid that conclusion are unpersuasive. They offer a limiting construction of the "receipt and disbursement" clause and a separate factual argument. Both arguments fail.

¶71 The limiting construction would limit liability of title insurance producers to acts involving "misappropriation or misdirection" of escrow funds. In support of that limitation, the title companies cite the statute's legislative history. They also cite an amicus brief filed by the Utah Insurance Department in a 2006 federal district court action involving section 407. As the title companies indicate, that brief asserted that section 407 "serves the important purpose of preventing the misdirection of escrow funds." And because the brief nowhere suggested that the "mere breach of a closing instruction would fall under the statute," the title companies urge us to limit this provision to the "misdirection" circumstance noted in the brief.

¶72 This argument fails on at least two levels. First is the fact that the limitation urged by the title companies appears nowhere on the face of the statute. Section 407 speaks generally of a title insurance producer's "receipt and disbursement" of escrow funds. This clause is not limited to the *misdirection* or *misappropriation* of such funds, and we will not read such a limitation into the statute. *See Nevares v. M.L.S.*, 2015 UT 34, ¶ 34, 345 P.3d 719.

¶73 Second, the title companies' argument confuses statutory *purpose* with statutory *text*. It may well be that the prevention of misdirection of escrow funds was the problem that sparked the legislature's attention in the first place. But statutes are not always limited to the problem that initiated legislative activity. And where the statute reaches more broadly, it is the statutory text that governs, not our understanding of the purpose that motivated its enactment.[11]

¶74 Perhaps such a limitation would be appropriate as a matter of legislative policy. As a policy matter, there are downsides to holding a title insurance company vicariously liable for all wrongs the producer perpetrates in the receipt and disbursement of escrow funds. It may even be that the legislature *meant* to limit the vicarious liability of title insurers to terms not stated on the face of section 407. But intentions are not laws unless they are enacted as such. So the answer to the title companies' policy concerns is that they are better directed to the body that enacted this statute. We reject the argument on that basis, while acknowledging the pre-

---

[11] *See Hooban v. Unicity Int'l, Inc.*, 2012 UT 40, ¶ 17, 285 P.3d 766 ("Our evaluation of the statute's purpose must start with its text, not the legislative history. Where the statute's language marks its reach in clear and unambiguous terms, it is our role to enforce a legislative purpose that matches those terms, not to supplant it with a narrower or broader one that we might infer from the legislative history. That history might identify a social problem that first sparked the legislature's attention. But we cannot presume that the legislature meant only to deal with that particular problem, as legislative bodies often start with one problem in mind but then reach more broadly in their ultimate enactment. And when they do, we cannot limit the reach of their enactment to the ill that initially sparked their interest." (footnotes omitted)).

rogative of the legislature to revisit section 407 if it prefers a limitation not evident on the face of the statute as it currently stands.

¶75 The title companies' factual argument likewise fails. The notion that United's alleged breaches arise not from its receipt and disbursement of earnest money but from its failure to collect documents is a distinction without a difference. The basis for Orlando's claim is the assertion that United improperly disbursed escrowed funds. And the collection of the documents in question was an express condition of the disbursement of escrow funds. So although it's true that United's alleged breach was its failure to collect documents, that failure was also inextricably connected to its receipt and disbursement of earnest money.

¶76 On these grounds we reject the title companies' argument under the "receipt and disbursement" clause. And on this point we hold that it is Orlando, and not the title companies, that is entitled to judgment in its favor.

3. Transactions "where a commitment" for "title insurance . . . has been ordered"

¶77 The third statutory limitation advanced by the title companies is in the clause that defines the types of transactions in which a title company's vicarious liability is triggered—in a "transaction[] where a commitment . . . for . . . title insurance of that title insurance company has been ordered." UTAH CODE 31A-23a-407. The title companies assert that this element is not satisfied here because the commitment for title insurance at issue was not "ordered" *by Orlando*. Again we disagree.

¶78 The grammatical structure of the statute forecloses the title companies' position. Instead of specifying a *subject* of the operative *verb* ("order[]"), section 407 speaks in the passive voice. All that is required is that a title insurance commitment "*has been* ordered." *Id*. (emphasis added). That passive formulation means that there is no requirement that the title insurance commitment be ordered *by* any particular party. And, as we noted earlier, we will not read a restriction into the statute that does not appear on its face. *See supra* ¶ 72; *Iselin v. United States*, 270 U.S. 245, 251

(1926) (Brandeis, J.) ("To supply omissions transcends the judicial function.").[12]

¶79 The limits on the liability in this statute appear in other clauses. The claimant must be "dealing with" the title insurance producer. And the transaction must involve the "receipt and disbursement of funds" in escrow. But where those (and other) statutory conditions are satisfied, it matters not *who* ordered the commitment for title insurance. It is enough that it "has been ordered." That is enough to defeat the title companies' argument, as there is no question that a title insurance commitment was ordered in this case.

4. A transaction in which a "preliminary report of the title insurance company has been issued or distributed"

¶80 A fourth ground for summary judgment is advanced only by First American. It seeks to get out of this case on the ground that there was no "preliminary report of the title insurance company" that was "issued or distributed" in First American's name. In First American's view, a report is "issued or distributed" only if it was sent intentionally. And First American claims that its involvement in this transaction was unintentional—the result of an unexplained move by United Title, in inadvertently sending a title insurance commitment mistakenly prepared in First American's name, but never intended to be sent (and never authorized by First American).

¶81 This argument is a nonstarter. It fails at the threshold because it invokes a clause of the statute that is simply inapplicable. Even if "issued or distributed" could be construed to mean sent *intentionally*, it would not matter because the "issued or distributed" clause is simply not implicated. That clause attaches, after all, to a "preliminary report of the title insurance company." UTAH

---

[12] In support of their argument on this point, the title companies cite the decision of our court of appeals in *Bodell*, 945 P.2d at 123–24. We find nothing in that decision that cuts against our analysis here, however. The *Bodell* court dismissed a plaintiff's section 407 claim under the "transactions" clause. *Id.* But the court's opinion provides no explanation for that decision, and thus no basis for calling our analysis into question. *Id.*

CODE § 31A-23a-407. And this case did not involve such a report. It involved a "commitment" for title insurance.

¶82 The First American document at issue, in other words, is not a "preliminary report"; it is a "commitment." And for this sort of document the statutory limitation has nothing to do with it being "issued or distributed." It has only to do with it being "ordered." We have already rejected the title companies' argument on that element, moreover. *See supra* ¶¶ 78–79. We therefore reject this additional argument raised by First American, and uphold Orlando's right to judgment on this issue.[13]

### 5. Constitutional avoidance

¶83 A final argument advanced by the title companies invokes the canon of constitutional avoidance. The constitutional issue they identify is a matter of due process. Specifically, the title companies challenge the rationality of a statutory scheme that imposes liability on title companies absent any evidence of fault,

---

[13] In so doing, we do not foreclose the possibility of First American advancing a related argument in further proceedings on remand. We concluded above that *a* title insurance commitment "has been ordered" in this case. *See supra* ¶ 79. That happened when IDR sought title insurance coverage—through a commitment provided through United—in connection with the SITLA property transaction. But that does not necessarily mean that *a First American title commitment* was "ordered." Under section 407 it is not sufficient that any old "commitment" for "title insurance" have been ordered. In order for the vicarious liability prescribed by statute to be triggered, the title insurance commitment that "has been ordered" must have been "of *that title insurance company*"—the title insurance company that is vicariously responsible for the liabilities of the title insurance producer. UTAH CODE § 31A-23a-407 (emphasis added). On remand, it may be that First American can demonstrate that no First American title commitment was "ordered" in connection with the SITLA property transaction. That could arguably be so, for example, if First American could establish that the commitment provided in its name was never "ordered"—by IDR or by United Title as its agent—but instead was simply prepared by mistake and without First American's approval. We need not and do not resolve that matter here, however, as it was not raised in the parties' briefing.

knowledge of misconduct, or capacity to prevent it. Stewart Title, in particular, asserts that it appointed United Title as a limited agent (not encompassing escrow services), and complains that it is irrational to impose liability on Stewart for United's escrow activities. And, in an attempt to avoid the constitutional problems that they identify, the title companies urge us to read a "meaningful involvement" limitation into section 407.

¶84 This argument fails at two levels. For one thing, the avoidance canon is not a license to rewrite statutes. It is a tool for interpreting them. If the title companies could identify "grave" constitutional questions with the application of section 407, the avoidance canon could justify our resolving ambiguities in the statute in a manner avoiding those problems. *See Utah Dep't of Transp. v. Carlson*, 2014 UT 24, ¶ 23, 332 P.3d 900. But the mere existence of such questions does not give us license to add a qualifier or limitation not evident on the face of the statute. And that is what the title companies request here. There is no way to read a "meaningful involvement" limitation on the vicarious liability set forth in section 407. We accordingly decline to do so.

¶85 Second, the constitutional concerns raised by the title companies are insufficient in any event. Section 407, as broadly written, may be subject to challenge on policy grounds. At some level it might make more sense to limit the vicarious liability of a title company for the acts of a title insurance producer to activities in which the former had some knowledge or participation. But the Due Process Clause is not a license for judicial second-guessing of legislative policy judgments.

¶86 To succeed in attacking section 407 on due process grounds, the title companies would have to show that there is no "rational basis" for imposing vicarious liability on title insurance companies for the acts of a title insurance producer. *Judd v. Drezga*, 2004 UT 91, ¶ 30, 103 P.3d 135 (stating that, for nonfundamental rights, "we apply a rational basis test in substantive due process cases"). This they cannot do. The principle of vicarious liability has been around for a long time, and has long been upheld against constitutional attack. *See Louis Pizitz Dry Goods Co. v. Yeldell*, 274 U.S. 112, 115 (1927).

¶87 "The extension of the doctrine of liability without fault to new situations to attain a permissible legislative object is not so

novel in the law or so shocking 'to reason or to conscience' as to afford in itself any ground for the contention that it denies due process of law." *Id.* Broad-sweeping liability for title insurance companies—extending beyond the acts of the title insurance producer—can be understood to advance a "permissible legislative object." Perhaps, as the title companies indicate, such liability would not effectively "prevent misappropriation of escrow funds" or "protect consumers by ensuring vigilance in monitoring escrow agents" in circumstances in which the title company has no knowledge of or involvement in those activities. But section 407 can easily be understood to encompass broader purposes—including, most obviously, the protection of (and compensation for) all parties "dealing with" title insurance producers for the "receipt and disbursement" of escrow funds. Such a legislative purpose is certainly permissible. And the apparent legislative goal of protecting that interest is sufficient to defeat the constitutional concern raised by the title companies.

## III

¶88 We reverse and remand for reasons set forth above. In so doing, we acknowledge the weight of some of the concerns raised by the title companies in this case. The opaque terms of Utah Code section 31A-23a-407 harbor some points of ambiguity; and candidly they give us some pause as to whether the extensive liability sought by Orlando was intended by the legislature. For reasons noted above, however, we interpret the broad terms of the statute to sustain the broad liability sought by Orlando, and leave the question whether to limit that liability for the legislature if it chooses to revisit this issue.

¶89 Perhaps the legislature will eventually adopt one or more of the limitations of liability advanced here by the title companies. But unless and until it does, we are left to give effect to the statutory language that it adopted. And we read that language to sustain statutory liability in this case, contingent on Orlando's success on the primary claim for breach of fiduciary duty.

———————

26