The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader.  The summaries may not be cited or relied upon as they are not the official language of the division.  Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
June 4, 2020

## 2020COA88

### No. 18CA2405, *Johnson-Linzy v. Conifer Care Communities* — Courts and Court Procedure — Arbitration — Colorado Uniform Arbitration Act; Contracts — Impossibility of Performance

A division of the court of appeals considers a question of first impression in Colorado — whether an arbitration agreement's incorporation of an arbitral forum's rules that require a now defunct arbitrator to administer them renders the agreement impossible to perform.  Based on the plain language of the arbitration agreement, the majority concludes that the parties agreed to arbitrate any disputes that arose between them, without regard to who was named as arbitrator.  Accordingly, the majority reverses the district court's order invalidating the agreement on the grounds of impossibility.

COLORADO COURT OF APPEALS                                    **2020COA88**

Court of Appeals No. 18CA2405
City and County of Denver District Court No. 18CV32187
Honorable Kenneth M. Plotz, Judge

Shalandra M. Johnson-Linzy, individually and as Personal Representative of
the Estate of Damien R. Linzy,

Plaintiff-Appellee,

v.

Conifer Care Communities A, LLC, d/b/a Amberwood Court Rehabilitation and
Care Community; Pinon Management, LLC; and QP Health Care Services, LLC,
d/b/a Vivage,

Defendants-Appellants.

ORDER REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE GROVE
Vogt*, J., concurs
Berger, J., dissents

Announced June 4, 2020

Reddick Moss, PLLC, Brian D. Reddick, Brent L. Moss, Robert W. Francis,
Little Rock, Arkansas, for Plaintiff-Appellee

Messner Reeves, LLP, Doug C. Wolanske, Kendra N. Beckwith, Mary Byrne
Fletcher, Dara N. Keller, Denver, Colorado, for Defendants-Appellants

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2019.

¶ 1    Plaintiff, Shalandra M. Johnson-Linzy, signed an arbitration agreement when her husband, Damien R. Linzy, was admitted to Amberwood Court Rehabilitation and Care Community (Amberwood Court), a skilled nursing facility owned and managed by defendants.[1]  Linzy stayed at Amberwood Court for several weeks and passed away shortly after he was discharged.  Johnson-Linzy then sued defendants for negligence and wrongful death, but defendants moved to stay her lawsuit and compel arbitration.  The district court denied the motion because it found that compliance with the arbitration agreement was impossible.  Defendants now appeal that order under section 13-22-228(1)(a), C.R.S. 2019.  We reverse.

¶ 2    The parties' dispute hinges on the validity of the arbitration agreement that Johnson-Linzy signed when she admitted her husband to Amberwood Court.  As relevant here, the agreement provides that any legal claim arising from care provided by

---

[1] The defendants are Conifer Care Communities A, LLC, d/b/a Amberwood Court Rehabilitation and Care Community, Pinon Management, LLC, and QP Health Care Services, LLC, d/b/a Vivage.

1

Amberwood Court "shall be resolved exclusively by binding arbitration," to be conducted

> in accordance with the Colorado Uniform Arbitration Act and the Code of Procedure of the National Arbitration Forum, and not by a lawsuit or resort to court process, except to the extent that applicable state or federal law provides for judicial review of arbitration proceeding or the judicial enforcement of arbitration agreements and awards.

Toward the end of the two-page agreement, in bold type and in all capital letters, the agreement states, "NOTE: BY SIGNING THIS AGREEMENT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL BINDING ARBITRATION RATHER THAN BY A JURY OR COURT TRIAL."

¶ 3      These provisions are unremarkable; similar language regularly appears in various consumer arbitration agreements.  However, the organization whose code of procedure the agreement identifies — the National Arbitration Forum (NAF) — exited the consumer arbitration business in 2009, nearly eight years before Linzy was admitted to Amberwood Court.  *See In re Nat'l Arbitration Forum Trade Practices Litig.*, 704 F. Supp. 2d 832, 835 (D. Minn. 2010) ("On July 14, 2009, the Minnesota Attorney General brought a

2

complaint . . . against NAF alleging consumer fraud act and deceptive trade practices act violations and false advertising.  NAF settled that litigation less than a week later, agreeing to cease performing consumer arbitrations and entering into a consent judgment to that effect.").

¶ 4     The demise of NAF's consumer arbitration business affected a wide variety of contracts and has spawned a substantial amount of litigation over the enforceability of arbitration agreements that identify NAF as arbiter or otherwise rely on its procedures.  *See Frazier v. W. Union Co.*, 377 F. Supp. 3d 1248, 1265-67 (D. Colo. 2019) (collecting cases).  Analyzing similar arbitration provisions, some courts have, like the district court here, held that NAF's unavailability makes it impossible to fulfill the parties' contractual expectations.  *See, e.g., Miller v. GGNSC Atlanta, LLC*, 746 S.E.2d 680, 688 (Ga. Ct. App. 2013).  Others have found NAF's status inconsequential because the language in question "does not mandate that the NAF actually *conduct* the arbitration — it requires only that the NAF Code be *applied* by the arbitrator."  *Meskill v. GGNSC Stillwater Greeley LLC*, 862 F. Supp. 2d 966, 972 (D. Minn. 2012).

¶ 5	The arguments in this case follow similar contours. As she did in the district court, Johnson-Linzy contends that the parties agreed to have NAF arbitrate any disputes between them and that its retreat from the consumer arbitration business renders the agreement invalid due to impossibility.[2] Defendants argue that the heart of the agreement is the desire to arbitrate disputes rather than litigate them and that the arbitration agreement's designation of the Code of Procedure of the National Arbitration Forum (NAF Code) is only a means to that end.[3]

¶ 6	In a brief written order, the district court agreed with Johnson-Linzy's argument that the arbitration agreement is unenforceable under the doctrine of impossibility and denied defendants' motion to compel arbitration:

> The Court specifically finds that the motion to compel arbitration and the motion for a stay in these proceedings are both denied. The Court finds that the agreement to arbitrate is impossible to comply with. The Court also

---

[2] Because the district court has not yet ruled on them, we do not consider any additional issues, such as unconscionability, that Johnson-Linzy has also argued make the arbitration agreement unenforceable.
[3] References to the NAF Code throughout this opinion are to its last revision, issued August 1, 2008.

4

> finds impossibility with regard [to] the use of the rules of NAF[.]

Defendants now appeal that order.

## I.    Analysis

¶ 7    At the threshold, defendants contend the district court did not have subject matter jurisdiction to determine the enforceability of the arbitration agreement because "[t]he parties agreed that solely an arbitrator would have the power to rule on issues relating to the Arbitration Agreement's validity, including objections concerning the Arbitration Agreement's enforceability."

¶ 8    In the alternative, defendants argue that NAF's unavailability is immaterial because the arbitration agreement does not require NAF to serve as the arbitral forum or arbiter, and instead only directs the parties to conduct arbitration "in accordance with" the NAF Code.[4]

---

[4] Because we conclude that this issue is dispositive, we do not address defendants' remaining contention, that section 13-22-211(1), C.R.S. 2019, of the Colorado Uniform Arbitration Act (CUAA) provides for appointment of a substitute arbitrator when the appointed arbitrator is unable to act.

### A. The District Court Had Jurisdiction to Determine Enforceability of the Arbitration Agreement

¶ 9 We first address defendants' argument that the order denying the motion to compel should be vacated because, by incorporating the NAF Code into their arbitration agreement, the parties agreed that only an arbitrator could resolve disputes concerning its enforceability. We conclude that the district court had jurisdiction to determine enforceability of the arbitration agreement because the parties did not plainly and unambiguously empower an arbitrator to decide that issue.

#### 1. Preservation

¶ 10 Johnson-Linzy contends that defendants waived their argument that the validity of the arbitration agreement is a question for the arbitrator by failing to raise it in the district court, and that we should therefore decline to consider it. Defendants respond that "[t]he enforceability issue is non-waivable because it concerns subject matter jurisdiction." We agree with defendants.

¶ 11 Arbitration is "a matter of contract between the parties; it is a way to resolve those disputes — but only those disputes — that the parties have agreed to submit to arbitration." *First Options of Chi.,*

*Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). A court must defer to an arbitrator's arbitrability decision — i.e., whether a particular dispute should be arbitrated — when the parties submit that matter to arbitration. *Id.* However, when the arbitrability decision is originally submitted to the court, rather than the arbitrator, the court's initial task "is to determine whether the agreement contains a valid and binding [arbitration] clause using traditional principles of contract interpretation." *City & Cty. of Denver v. Dist. Court*, 939 P.2d 1353, 1363 (Colo. 1997). The court must determine the threshold arbitrability issue because "[a] valid and enforceable arbitration provision divests the courts of jurisdiction over all disputes that are to be arbitrated pending the conclusion of arbitration." *Mountain Plains Constructors, Inc. v. Torrez*, 785 P.2d 928, 930 (Colo. 1990).

¶ 12    Thus, because objections to the enforceability of an arbitration agreement implicate the court's subject matter jurisdiction, they may be raised for the first time on appeal. *Kaplan*, 514 U.S. at 943; *Colo. Dep't of Pub. Health & Env't v. Caulk*, 969 P.2d 804, 807 (Colo. App. 1998) ("[C]hallenges to subject matter jurisdiction cannot be waived and may be asserted at any time . . . .").

7

## 2. Enforceability Determination is for the Court

¶ 13    We turn next to defendants' argument that the NAF Code, which, by its terms "shall be deemed incorporated by reference in every Arbitration Agreement[] which refers to the National Arbitration Forum . . . or this Code of Procedure unless the Parties agree otherwise," requires that an arbitrator, not a court, determine issues of enforceability.  NAF Code, Rule 1.A.

¶ 14    Johnson-Linzy responds that the arbitration agreement is ambiguous because it incorporates the CUAA — which provides for judicial resolution of arbitrability, *see* § 13-22-206(2), C.R.S. 2019 — along with the NAF Code, which states that "[a]n Arbitrator shall have the power to rule on . . . the existence, scope, and validity of the Arbitration Agreement including all objections relating to jurisdiction, unconscionability, contract law, and enforceability of the Arbitration Agreement."  NAF Code, Rule 20.F.

### a. Standard of Review

¶ 15    We review de novo the question whether arbitrability is for the court or for the arbitrator to decide.  *See Taubman Cherry Creek Shopping Ctr., LLC v. Neiman-Marcus Grp., Inc.*, 251 P.3d 1091, 1093 (Colo. App. 2010).

¶ 16    Colorado's preference for the resolution of disputes through arbitration is embedded in both the Colorado Constitution and the CUAA. Colo. Const. art. 18, § 3; *see also J.A. Walker Co. v. Cambria Corp.*, 159 P.3d 126, 128 (Colo. 2007). Under the CUAA, "[t]he court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate." § 13-22-206(2). Parties may waive or vary the effect of the CUAA "to the extent permitted by law." § 13-22-204(1), C.R.S. 2019. To deviate from the CUAA, however, "the law requires that parties must *plainly and unambiguously* empower an arbiter to decide arbitrability and that they must *clearly and knowingly* assent to terms incorporated by reference." *Taubman*, 251 P.3d at 1095.

c.    Discussion

¶ 17    Parties may incorporate specific arbitration rules, such as the NAF Code, by expressly providing that those rules will govern any dispute within the scope of their arbitration agreement. *Taubman*, 251 P.3d at 1094. And courts generally accept that if parties to an arbitration agreement have explicitly incorporated a rule that empowers the arbitrator to determine arbitrability, that

9

incorporation amounts to clear and unmistakable evidence of the parties' intent to delegate that issue to the arbitrator. *See, e.g.*, *Ahluwalia v. QFA Royalties, LLC*, 226 P.3d 1093, 1098 (Colo. App. 2009) (collecting cases).

¶ 18 Although the arbitration agreement here incorporates the NAF Code, it also incorporates the CUAA. In our view, the incorporation of both authorities creates an ambiguity as to which entity is empowered to decide whether the underlying agreement is valid. *Compare* § 13-22-206(2) ("The court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate."), *with* NAF Code, Rule 20.F ("An Arbitrator shall have the power to rule on all issues, Claims, Responses, questions of arbitrability, and objections regarding the existence, scope, and validity of the Arbitration Agreement including all objections relating to jurisdiction, unconscionability, contract law, and enforceability of the Arbitration Agreement."). The incorporation of both sets of rules cannot "plainly and unambiguously empower an arbiter to decide arbitrability." *Taubman*, 251 P.3d at 1095.

¶ 19     We are not persuaded otherwise by defendants' argument that "the express reference to both the CUAA and [the NAF] Code does *not* create ambiguity, but instead clarifies the applicable procedural rules." To the contrary, determining arbitrability is presumptively the court's job, unless the parties "*clearly and knowingly* assent to terms incorporated by reference." *Taubman*, 251 P.3d at 1095. Here, the parties incorporated by reference two sets of rules into the arbitration agreement. Expecting a consumer in Johnson-Linzy's position to read and reconcile both sources, and, based on that evaluation, definitively conclude that she is consenting to forgo judicial review of the agreement's enforceability, simply does not meet that threshold. As another court aptly put it, the incorporation of forty-two pages of arbitration rules, not to mention the entire CUAA, into an arbitration clause "is tantamount to inserting boilerplate inside of boilerplate, and to conclude that a single provision contained in those rules amounts to clear and unmistakable evidence of an unsophisticated party's intent would be to take 'a good joke too far.'" *Allstate Ins. Co. v. Toll Bros., Inc.*, 171 F. Supp. 3d. 417, 429 (E.D. Pa. 2016) (citation omitted).

## B. The Arbitration Agreement Is Enforceable

¶ 20  Having determined that the district court had jurisdiction to determine whether the arbitration agreement is enforceable, we turn next to defendants' contention that NAF's unavailability is "irrelevant to the agreement's enforcement."  In defendants' view, the arbitration agreement does not explicitly or implicitly require NAF to serve as the arbitral forum or arbitrator — meaning that, notwithstanding the termination of NAF's consumer arbitration business, another arbitrator could use the NAF Code to preside over the arbitration.  Johnson-Linzy responds that, by invoking the NAF Code, the parties agreed to employ NAF to arbitrate any dispute, and that NAF's unavailability thus renders their agreement impossible to perform.

### 1. Standard of Review

¶ 21  We review "de novo the district court's decision on a motion to compel arbitration, employing the same legal standards that the district court employed." *Lujan v. Life Care Ctrs. of Am.*, 222 P.3d 970, 972 (Colo. App. 2009).

## 2.    Applicable Law

¶ 22    The CUAA requires the court to decide whether an agreement to arbitrate exists and whether a controversy is subject to an agreement to arbitrate — that is, whether the dispute is within the "scope" of the arbitration clause. *City & Cty. of Denver*, 939 P.2d at 1363. Thus, there are only two grounds upon which a court may deny a motion to compel arbitration: (1) there is no valid agreement to arbitrate; or (2) the issue sought to be arbitrated is clearly beyond the scope of the arbitration provision. If the court determines that there is no enforceable agreement, it may not order the parties to arbitrate. § 13-22-207(3), C.R.S. 2019.

¶ 23    "The party seeking to stay proceedings in a judicial forum and to compel arbitration has the burden of establishing that the matter is subject to arbitration." *Smith v. Multi-Fin. Sec. Corp.*, 171 P.3d 1267, 1270 (Colo. App. 2007). "As a general rule, courts should follow state law principles governing contract formation to determine whether the parties agreed to submit an issue to alternative dispute resolution." *City & Cty. of Denver*, 939 P.2d at 1361. "The right of parties to contract freely is well developed in our jurisprudence." *Id.* That right "encompasses the correlative

13

power to agree to a specific [alternative dispute resolution] procedure for resolving disputes." *Id.* We construe an arbitration agreement's terms "in a manner that best effectuates the intent of the parties and allows each party to receive the benefit of the bargain." *Id.*

¶ 24 In determining the parties' intent at the time they agreed to the contract, we "must construe the [c]ontract as a whole and effect must be given to every provision, if possible." *Id.* at 1365. And, under Colorado law, arbitration agreements are "valid, enforceable, and irrevocable" except where a ground exists under law or equity for the contract's revocation. § 13-22-206(1).

¶ 25 As the Missouri Supreme Court put it, for our purposes, "there are two types of arbitration agreements: (1) agreements in which the parties agree to arbitrate regardless of the availability of a named arbitrator, and (2) agreements in which the parties agree to arbitrate before — but *only* before — a specified arbitrator." *A-1 Premium Acceptance, Inc. v. Hunter*, 557 S.W.3d 923, 926 (Mo. 2018). We conclude that the parties here agreed to arbitrate without regard to who was named as arbitrator.

### 3. Discussion

¶ 26    We reach this conclusion based on the plain language of the arbitration agreement.  Most importantly, the agreement does not state that arbitration will be conducted "by" NAF, or even by an arbiter affiliated with or approved by NAF.  To the contrary, the agreement requires only that "binding arbitration . . . be conducted . . . in accordance with the [CUAA] and the [NAF Code], and not by a lawsuit or resort to court process . . . ."  And the bolded, all-capital disclaimer at the close of the agreement ("NOTE: BY SIGNING THIS AGREEMENT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL BINDING ARBITRATION RATHER THAN BY A JURY OR COURT TRIAL") similarly emphasizes its core goal — requiring arbitration — without suggesting that carrying through with the process is contingent on the selection of any particular arbitrator.

¶ 27    To be sure, the NAF Code, which is "deemed incorporated by reference" into every arbitration agreement that refers to NAF, provides that "[t]his Code shall be administered only by [NAF] or by any entity or individual providing administrative services by agreement with [NAF]."  NAF Code, Rule 1.A.  Johnson-Linzy argues

15

that this provision makes "[t]he availability of the NAF to administer the parties' arbitration an all-or-nothing proposition."  We are unpersuaded because "if the parties had contemplated the NAF would be their exclusive arbitral forum, they could have easily said so — there would be no need for them to do so obliquely by 'specify[ing] that the arbitration must be conducted by [the NAF's] rules.'"  *Meskill,* 862 F. Supp. 2d at 973 (alterations in original) (citation omitted).  Indeed, we note that in a number of cases, courts have relied on just such an explicit designation as grounds for invalidating the agreement.  *See, e.g., Wert v. Manorcare of Carlisle PA, LLC,* 124 A.3d 1248, 1263 (Pa. 2015) (emphasizing arbitration agreement's provision that any disputes "shall be resolved *exclusively* by binding arbitration to be conducted . . . in accordance with the [NAF] Code of Procedure, which is hereby incorporated into this Agreement"); *see also GGNSC Atlanta, LLC,* 746 S.E.2d at 686 (same).

¶ 28     On the other hand, most cases analyzing language similar to the arbitration agreement at issue here have concluded that the agreement remains enforceable despite NAF's unavailability.  *See Robinson v. EOR-ARK, LLC,* 841 F.3d 781, 784 (8th Cir. 2016)

(declining to invalidate arbitration agreement that provided for arbitration "in accordance with the National Arbitration Forum Code of Procedure, ('NAF') which is hereby incorporated into th[e] agreement, and not by a lawsuit or resort to court process"); *GGNSC Holdings, LLC v. Lamb*, 487 S.W.3d 348, 356 (Ark. 2016) (same); *Wright v. GGNSC Holdings LLC*, 808 N.W.2d 114 (S.D. 2011) (same); *see also Paulozzi v. Parkview Custom Homes, L.L.C.,* 122 N.E.3d 643, 646 (Ohio Ct. App. 2018) (declining to invalidate arbitration agreement calling for "arbitration [to] be conducted under the auspices of the [now defunct] Ohio Arbitration and Mediation Center in accordance with its rules"). We agree with the analysis in these cases. As with our jurisdictional analysis above, we are reluctant to examine "boilerplate inside of boilerplate," *Toll Bros., Inc.,* 171 F. Supp. 3d at 429, particularly where the primary document — the arbitration agreement itself — invokes the NAF Code without explicitly designating NAF as the arbitrator, thereby suggesting that "the parties anticipated an entity *other than* the NAF might conduct the arbitration." *Meskill*, 862 F. Supp. 2d at 973. And the express incorporation of the CUAA in the agreement

that we consider here only bolsters our conclusion that its intent is to require arbitration without regard to the identity of the arbitrator.

¶ 29 In sum, we conclude that while the arbitration agreement memorializes both the parties' intention to arbitrate and the rules that would govern that arbitration, it leaves open the possibility that an individual other than NAF could conduct the proceedings. The parties thus did not designate NAF as the exclusive arbiter of any future disputes; NAF's cessation of consumer arbitrations as a result of the consent judgment therefore does not stand as a barrier to the arbitration of Johnson-Linzy's claims.

## II. Conclusion

¶ 30 The order is reversed and the case is remanded to the district court. If the district court denies the remaining challenges to the enforceability of the arbitration agreement that it did not resolve before this appeal, then it must compel arbitration and stay the case while arbitration proceeds.

JUDGE VOGT concurs.

JUDGE BERGER dissents.

18

JUDGE BERGER, dissenting.

¶ 31    Arbitration is a matter of contract.  *N.A. Rugby Union LLC v. U.S. Rugby Football Union*, 2019 CO 56, ¶ 20.  As with any contract, the parties, not judges, prescribe the terms.  *W. Stone & Metal Corp. v. DIG HP1, LLC*, 2020 COA 58, ¶ 10.  It follows that courts must enforce *all*, not just some, of the terms of an arbitration agreement.[1] And when the terms of the parties' arbitration agreement are

---

[1] I recognize the reality that in most consumer arbitrations, the arbitration agreement is a contract of adhesion.  *See Lamps Plus, Inc. v. Varela*, 587 U.S. ___, ___, 139 S. Ct. 1407, 1420-22 (2019) (Ginsburg, J., dissenting); *DIRECTV v. Imburgia*, 577 U.S. ___, 136 S. Ct. 463, 471-78 (2015) (Ginsburg, J., dissenting); *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 124-33 (2001) (Stevens, J., dissenting).  It is absurd to think that either the plaintiff or the plaintiff's husband in this case actually wanted to arbitrate any claims of improper care; they had no choice because admission to the nursing home almost certainly was dependent on their agreeing to the terms of adhesion, including the arbitration agreement. Despite these realities, the United States Supreme Court has expanded, beyond recognition, the modest and salutary policies enshrined in the Federal Arbitration Act, 9 U.S.C. §§ 1-307 (2018). *See Lamps Plus*, 587 U.S. at ___, 139 S. Ct. at 1420-22 (Ginsburg, J., dissenting); *DIRECTV*, 577 U.S. at ___, 136 S. Ct. at 471-78 (Ginsburg, J., dissenting); *Circuit City*, 532 U.S. at 124-33 (Stevens, J., dissenting).  But nothing in the cases decided by the United States Supreme Court or the Colorado Supreme Court (or the provisions of the Colorado Uniform Arbitration Act, sections 13-22-201 to -230, C.R.S. 2019) require or permit a court to disregard the terms of the parties' agreement and order arbitration when the express terms of the arbitration agreement are impossible to perform.

impossible to perform, the arbitration agreement, like any other contract, fails. *City of Littleton v. Emp'rs Fire Ins. Co.*, 169 Colo. 104, 108-09, 114, 453 P.2d 810, 812, 815 (1969). This, of course, does not mean that the parties forfeit any of their substantive contractual rights; it means only that their dispute is resolved by a court, not an arbitrator.

¶ 32 These contract principles are not diluted or dispensed with because public policy favors arbitration. Public policy favors arbitration only when the parties have agreed to it. Public policy does not authorize judges to substitute provisions they think are better or more reasonable, for those prescribed by the parties.

¶ 33 As the majority recognizes, the parties' arbitration agreement expressly requires the arbitration to be governed by the NAF Code. The NAF Code, in turn, expressly provides that "[t]his Code shall be administered *only* by [NAF] or by any entity or individual providing administrative services by agreement with [NAF]." (Emphasis added.) That is impossible because after being accused by the Minnesota Attorney General of being partial to businesses and merchants, and prejudiced against consumers, NAF ceased

providing consumer arbitration services.  *Supra* ¶ 3 (majority opinion).

¶ 34    To avoid invalidation of the arbitration agreement, the majority relies on the fact that the provision designating NAF as the administrator is contained in the NAF Code, rather than in the body of the agreement.  This, the majority reasons, signals that the parties did not actually intend to be bound by that provision, even though the agreement clearly states that the NAF Code controls.[2]

¶ 35    It is black letter law that when a contract is clear and unambiguous, we apply its terms without regard to the parties' subjective intent.  *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 150 (2009) (citing 11 R. Lord, *Williston on Contracts* § 30:4 (4th ed. 1999)).  This objective analysis requires that we interpret the arbitration agreement as written and hold that it fails.

---

[2] The majority wisely does not rely on the "integral part" test adopted by some courts to justify ignoring disfavored provisions of an arbitration agreement.  As agreed by both the majority and dissent in *Green v. U.S. Cash Advance Illinois, LLC*, 724 F.3d 787 (7th Cir. 2013) (Easterbook, C.J., writing for the majority and Hamilton, J., dissenting), the integral part test finds no support in the Federal Arbitration Act or other law.  It simply was made up by judges and, as Judge Hamilton explains, is plainly at odds with basic concepts of contract law.  *Id.*

¶ 36    To disregard the clear language in the NAF Code, the majority

relies on *Allstate Insurance Co. v. Toll Brothers, Inc.*, 171 F. Supp.

3d 417 (E.D. Pa. 2016).  But that Pennsylvania case, which in any

event is not binding on this court, is inapposite.  There, the court

declined to enforce a provision of the separate arbitration rules

referenced in a sale agreement against an individual homebuyer

because the homebuyer was "unsophisticated" and it would be a

"joke" to think the homebuyer signed the agreement having read the

entirety of the rules cross-referenced in the agreement.  *Id.* at 429.

¶ 37    We have the *exact opposite situation* here.  The defendants —

sophisticated, corporate entities presumably acting on the advice of

counsel — drafted the agreement.  They selected the NAF Code to

govern arbitration — despite the fact that NAF had been defunct for

a number of years and the NAF Code clearly provides that only NAF

or an affiliated entity may administer it.  The defendants must live

with that decision.

¶ 38    As the *Allstate* court recognized, its decision represented an

exception — based on the sophistication of one of the parties —

from the holdings of almost every other circuit court that had

addressed the issue.  *Id.* at 427.  Irrespective of whether that

exception is consistent with the United States Supreme Court's expansive reading of the Federal Arbitration Act, *see supra* note 1, at 19-20, the exception has no application here. To hold otherwise would be to render meaningless references to governing rules in all agreements, a result that finds no support in the law.

¶ 39 The fact that the parties "could" have included an express designation of NAF as the sole administrator elsewhere in their agreement is irrelevant. *Supra* ¶ 27 (majority opinion). The parties could have done a lot of things. The plaintiff and her husband, assuming they even knew what rights they were forgoing by agreeing to arbitration, could have attempted to search for a nursing home that did not require arbitration. Or they could have delayed the husband's admission to the nursing home for the two years it would have taken to resolve a declaratory judgment action against the nursing home, asserting that the arbitration agreement was a contract of adhesion and was, therefore, unenforceable. But the fact that the plaintiff and her husband did none of these things simply has no bearing on whether a court should or must enforce a clear provision of the contract.

¶ 40 The choices made by contracting parties have consequences and demand respect by courts. That respect compels the conclusion that the parties' arbitration agreement failed.

¶ 41 For these reasons, I would affirm the district court order denying arbitration, and I respectfully dissent from the majority's contrary disposition.[3]

---

[3] I agree with the majority's analysis that the court, rather than an arbitrator, decides the question of the validity of the arbitration agreement.