**2023 UT App 109**

# THE UTAH COURT OF APPEALS

FIRST AMERICAN TITLE INSURANCE COMPANY AND KIRSTEN PARKIN,
Appellants,
*v.*
DANA BARRON, ET AL.,
Appellees.[1]

Opinion
No. 20220047-CA
Filed September 21, 2023

Third District Court, Salt Lake Department
The Honorable Keith A. Kelly
No. 210903427

David W. Tufts, J. Tayler Fox, and Douglas W.
Henkin, Attorneys for Appellants

Steven W. Call, Jonathan A. Dibble, Z. Ryan Pahnke,
R. Troy Mollerup, and Carol Ann Funk, Attorneys
for Appellees

JUDGE RYAN D. TENNEY authored this Opinion, in which JUDGES
GREGORY K. ORME and JOHN D. LUTHY concurred.

TENNEY, Judge:

¶1      First American Title Insurance Company and its employee
Kirsten Parkin (collectively, First American) were sued for

---

1. In addition to Dana Barron, Appellees include, in the order
listed in the briefing: Victor M. Szurgot, Jr.; Linda J. Szurgot; Keith
E. King; Tytanium 4, LLC; William B. Maloney; Douglas S.
Peterson; Kathleen S. Peterson; Kathleen S. Peterson & Douglas S.
Peterson ("as trustees of The Lowell S. & Kathleen S. Peterson
Intervivos Trust"); Toot, Inc.; MDB Ventures, LLC; JDB Holdings,
LLC; Kent S. Seymour; Kathie Muhler; Noah Rockwell, LLC; and
Eldridge Holdings Too, LLC.

allegedly participating in a fraudulent real estate scheme. The district court denied First American's motion to compel arbitration. For the reasons set forth below, we reverse that decision.[2]

BACKGROUND

*The Purchase Agreements and Title Insurance*

¶2      Sometime between early October and early November 2018, Rockwell Debt Free Properties, Inc. (Rockwell) purchased a "parcel of land and a commercial building" (the Property) located in Westminster, Colorado, from William and Shirley Newman. From November 2018 through the beginning of 2019, Rockwell entered into separate real estate purchase and sale agreements (PSAs) with 14 different individuals, trustees, and companies (collectively, Purchasers). Each PSA provided for the purchase of a "fractional interest[]" in the Property. Purchasers bought interests of varying percentages in the Property for a combined total purchase price of $5,484,856.46.

¶3      The PSAs each contained the following arbitration clause:

> **9. Arbitration.** Any dispute between the parties will be submitted to binding arbitration according to the

---

2. As discussed more fully in note 6, both parties agree that Parkin was First American's agent with respect to the transactions that are at the heart of this case. We note here that Parkin and First American were represented by the same counsel below, that they proceeded with a joint defense below, and that neither side's brief on appeal draws a distinction between First American and Parkin with respect to the issue on which we ultimately decide this case. Given these dynamics, and for simplicity of usage, we'll refer to "First American" throughout this opinion when referring to the actions and positions taken by First American and Parkin.

Commercial Rules of the American Arbitration Association, but need not be filed with that organization. Except for actions relating to the payment of money for services rendered, an action under this Agreement must be filed within 90 days of the date of closing pursuant to this Agreement. Arbitration will be conducted in Colorado, before a single arbitrator. . . . If the amount in controversy exceeds $25,000, the arbitrator's decision will include a statement specifying in reasonable detail the basis for and computation of the award, if any.

¶4 First American acted as the title insurer and escrow agent for each of these transactions. Indeed, the PSAs themselves contained a clause that specifically required Purchasers to use First American as the escrow agent for the transactions, stating that the "balance of the purchase price shall be wired, or otherwise transferred, to First American Title Company within twenty-four hours of closing." First American issued final settlement statements for each transaction, and each final settlement statement identified the settlement date, the disbursement date, and the consideration amount.

¶5 The Title Insurance Policy (the Insurance Policy) that First American issued to each of the Purchasers through endorsements contained an arbitration clause of its own. It read:

**14. ARBITRATION . . .**

Either [First American] or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). . . . All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either [First American] or the Insured. All arbitrable matters when the Amount of Insurance

is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties.

¶6 The Insurance Policy also contained a section titled "Definition of Terms," under which "Amount of Insurance" was defined as "[t]he amount stated in Schedule A, as may be increased or decreased by endorsement to this policy." The "Amount of Insurance" listed in Schedule A of the Insurance Policy was $3,535,000.

*Purchasers' Complaint and First American's Motion to Compel Arbitration*

¶7 In June 2021, Purchasers filed a complaint against First American in Utah state court.[3] Purchasers alleged that First American actively participated with Rockwell and others in a fraudulent scheme to misrepresent the value of the Property and improperly induce Purchasers into signing the PSAs. Purchasers pleaded 14 claims against First American, including claims for intentional misrepresentation, fraud, fraud in the inducement, breach of contract, civil conspiracy, and negligent misrepresentation.

¶8 In August 2021, First American filed a motion to compel arbitration. First American argued that the PSAs and the Insurance Policy were both governed by Colorado law. It also argued that Colorado law "strongly favors arbitration" and has a "presumption in favor of arbitration" that should be applied to these agreements.

---

3. Purchasers also sued other parties involved in the transactions and alleged scheme on mostly similar grounds, but those claims and parties are not before us in this appeal.

¶9      First American then argued that it was entitled to invoke the arbitration clauses from the PSAs and the Insurance Policy. With respect to the PSAs, First American argued that although it was a non-signatory to those agreements, it was "entitled to enforce the PSA arbitration clause because Colorado law allows non-signatories to compel arbitration when, *inter alia*, (i) the non-signatory is an agent of a signatory, (ii) the non-signatory is a third-party beneficiary, or (iii) estoppel applies." First American argued that it could invoke the PSAs' arbitration clause under each of these doctrines.

¶10     With respect to the Insurance Policy, First American argued that it could "compel [Purchasers] to individually arbitrate their claims because the Amount of Insurance at issue [was] less than $2,000,000 for each [purchaser]." While First American acknowledged that the "Amount of Insurance" in the Insurance Policy was identified as $3,535,000, it claimed that the endorsements issued to each Purchaser amended the Insurance Policy to only insure Purchasers for a fractional share of that amount, thus bringing the Amount of Insurance for each Purchaser below the $2,000,000 threshold.

¶11     Purchasers opposed First American's motion to compel arbitration. In Purchasers' view, Utah law "applie[d] because the interpretation of a contract is procedural in nature." But even so, Purchasers argued that "the law in Colorado [was] the same." And in Purchasers' view, Colorado's presumption in favor of arbitration did not apply in these circumstances and ambiguities in the arbitration clause meant that the clause should actually be construed against First American. Purchasers also argued that First American was not a signatory to the PSAs and had not established that it had any right under any legal doctrine to enforce the arbitration clause that was contained in the PSAs. Finally, Purchasers argued that the arbitration clause from the Insurance Policy was inapplicable because the Amount of

Insurance "exceed[ed] the $2,000,000 ceiling for compelling arbitration."

¶12 After hearing oral arguments, the district court denied First American's motion to compel arbitration. With respect to the initial choice of law question, the district court concluded that "the analysis [was] the same under Utah and Colorado law, [and] each would reach the same result." It thus saw no need to definitively answer that question.

¶13 Turning to the substantive arguments, the district court agreed with Purchasers on all fronts. With respect to the PSAs, the court concluded that First American was not a party to the PSAs and that First American had not established that it had any right as a non-party to invoke the PSAs' arbitration clause. In addition, the court found it "unpersuasive" that First American would "seek to cite and rely on the arbitration clause in the PSAs" when its own contractual agreement with Purchasers—i.e., the Insurance Policy—"contain[ed] [its] own arbitration terms." With respect to the arbitration clause from the Insurance Policy, the court concluded that the applicable Amount of Insurance exceeded $2,000,000 and that First American therefore could not compel Purchasers to arbitrate.

¶14 First American timely appealed.

## ISSUE AND STANDARD OF REVIEW

¶15 First American challenges the district court's denial of its motion to compel arbitration. "Whether a trial court correctly decided a motion to compel arbitration is a question of law which we review for correctness, according no deference to the district judge." *MacDonald Redhawk Invs. v. Ridges at Redhawk, LLC*, 2006 UT App 491, ¶ 2, 153 P.3d 787 (quotation simplified). "Whether a claim falls under an arbitration clause is a matter of contractual interpretation, which is reviewed for correctness." *HITORQ, LLC*

*v. TCC Veterinary Services, Inc.*, 2021 UT 69, ¶ 20, 502 P.3d 281 (quotation simplified).

ANALYSIS

¶16 First American argues that it was entitled to compel arbitration under the arbitration clause from the PSAs as well as the arbitration clause from the Insurance Policy, and it advances several arguments on each front. As set forth below, we conclude that First American can compel arbitration as a third-party beneficiary of the PSAs. Because of this, we need not address First American's other arguments.[4]

I. Choice of Law

¶17 We first briefly address the choice of law question that was raised below and which ultimately informs some of our analysis. First American argues that Colorado law governs the question of whether it can invoke the arbitration clause from the PSAs, while Purchasers suggest that the question should be decided under Utah law. We agree with First American.

¶18 "When determining which state's laws apply to a dispute between two contracting parties, the law of the forum state governs the choice of law analysis." *Volonte v. Domo, Inc.*, 2023 UT App 25, ¶ 73, 528 P.3d 327 (quotation simplified). And when

---

4. In response to some of First American's arguments, Purchasers claim that there was a disconnect between the Amount of Insurance that was identified in the Insurance Policy and the "Proposed Policy Amount" that was identified in certain "Title Commitment" documents associated with these transactions. From this, Purchasers then argue that the arbitration clause from the Insurance Policy was unenforceable. Because we conclude that First American can enforce the arbitration clause from the PSAs, we need not address this argument.

"determining which state's laws will apply to a dispute, Utah courts first look to whether there was an effective choice of law by the parties." *Id.* ¶ 74 (quotation simplified). If there wasn't an effective choice of law by the parties, our courts "apply the most significant relationship approach as described in the Restatement (Second) of Conflict of Laws in determining which state's laws should apply to a given circumstance." *Id.* (quotation simplified).

¶19 There was an effective choice of law by the parties in this case. "When interpreting a contract, we begin by looking within the four corners of the contract to determine the parties' intentions, which are controlling." *Innerlight, Inc. v. Matrix Group, LLC*, 2009 UT 31, ¶ 14, 214 P.3d 854 (quotation simplified). "If the language within the four corners of the contract is unambiguous, a court determines the parties' intentions from the plain meaning of the contractual language as a matter of law." *Id.* (quotation simplified). Here, each PSA contained an identical provision stating, "This Agreement will be subject to, and governed by the laws of the state of Colorado." And each PSA was signed by both the respective purchaser and Rockwell's president. The choice of law provisions from the PSAs are controlling, and under their plain terms, Colorado law controls the question before us.

## II. Third-Party Beneficiary

¶20 First American argues that it was entitled to enforce the PSAs' arbitration clause as a "third-party beneficiary" to those agreements. We agree.

¶21 Under Colorado law, "[a] person who is not a party to an agreement containing an arbitration provision generally lacks standing to compel, and is not subject to, arbitration." *Vallagio at Inverness Residential Condo. Ass'n v. Metropolitan Homes, Inc.*, 2015 COA 65, ¶ 51, 412 P.3d 709. But "a non-party, such as a third-party beneficiary, may fall within the scope of an arbitration agreement and compel its enforcement if that is the intent of the parties." *Id.* "A third-party beneficiary may enforce a contract only if the

parties to that contract intended to confer a benefit on the third party when contracting . . . ." *Everett v. Dickinson & Co., Inc.*, 929 P.2d 10, 12 (Colo. App. 1996). "While the intent to benefit" a non-signatory "need not be expressly recited in the contract, the intent must be apparent from the terms of the agreement, the surrounding circumstances, or both." *Vallagio*, 2015 COA 65, ¶ 52 (quotation simplified). In this sense, it "is not enough that some benefit incidental to the performance of the contract may accrue to the third party." *Everett*, 929 P.2d at 12. Rather, the "critical fact that determines whether a nonsignatory is a third-party beneficiary is whether the underlying agreement manifests an intent to confer specific legal rights upon the nonsignatory." *N.A. Rugby Union LLC v. United States of America Rugby Football Union*, 2019 CO 56, ¶ 34, 442 P.3d 859 (quotation simplified).

¶22 Under these principles, the question before us is whether the parties to the PSAs manifested an intent to confer a specific legal right on First American. We conclude that they did. The PSAs were real estate purchase contracts, and such transactions ordinarily involve the use of an escrow agent. What's particularly noteworthy here is that the PSAs contained a provision under which "[t]he balance of the purchase price shall be wired, or otherwise transferred, *to First American Title Company* within twenty-four hours of closing." (Emphasis added.) The PSAs didn't just contemplate the use of an escrow agent; rather, they expressly required the parties to use First American for these purposes. Because of this, there was nothing "incidental" about the benefit that was conferred by these agreements on First American. Rather, the contracts themselves placed First American in a key role in the transactions.

¶23 In their brief, Purchasers pointed to no controlling Colorado authority that would hold that First American did not have third-party beneficiary rights under these circumstances. Rather, the authority Purchasers relied on simply establishes Colorado's baseline approach to the third-party beneficiary rule,

under which parties must intend to confer a benefit on the third party when contracting. As just noted, we conclude that these contracts show that these parties intended to confer a benefit on First American in these transactions.

¶24    At oral argument, Purchasers pointed to two cases—*Peters v. Keyes Co.*, 402 F. App'x 448 (11th Cir. 2010) (per curiam), and *Lesieur v. Fryar*, 325 S.W.3d 242 (Tex. App. 2010)—both of which more specifically suggest, in their view, that an escrow agent would not have third-party beneficiary rights. Putting aside the problems associated with waiting until oral argument to first point to the supportive authority that most specifically addresses the issue at hand, we're still not convinced.

¶25    These cases are not Colorado cases, so they're not mandatory authority in this appeal. Still, like other jurisdictions in our federal system, Colorado courts could rely on them as persuasive authority, which is how Purchasers ask us to use them.

¶26    But Colorado's appellate courts have on some occasions found Utah cases to be persuasive too. *See, e.g.*, *Tremitek, LLC v. Resilience Code, LLC*, 2023 COA 54, ¶ 38, 2023 WL 4055339 (citing a Utah Court of Appeals opinion as "persuasive" authority); *People v. Sharp*, 2019 COA 133, ¶ 36, 459 P.3d 725 (same); *People v. Marshall*, 2014 COA 42, ¶ 24, 348 P.3d 462 (explaining that dictum in a prior Colorado opinion was "persuasive" given that "courts in other states" had "reached the same conclusion," and then citing a Utah Supreme Court case as one example). And on the question before us in this case, we find the logic of the Utah Supreme Court's decision in *Orlando Millenia, LC v. United Title Services of Utah, Inc.*, 2015 UT 55, 355 P.3d 965, to be persuasive. *Orlando Millenia* had an admittedly "complicated" factual background. *Id.* ¶ 4. In brief, a lender sued an escrow agent based on the escrow agent's actions in conjunction with a real estate transaction between a buyer (who had received money from the lender) and a seller. *Id.* ¶¶ 1, 5–7. On appeal, the Utah Supreme

Court held that although the lender hadn't signed either the real estate contract or the escrow agreement, the lender could still sue the escrow agent as a third-party beneficiary of the escrow agreement. *Id.* ¶¶ 37–40. The court noted that the lender was "expressly named in the special escrow instructions" and that the escrow agreement required "specific actions" from the lender before the escrow agent could "disburse the funds" to the seller. *Id.* ¶ 38. Because of this, the court concluded that the lender was "no mere incidental beneficiary" of the escrow agreement, but that it was "for all practical purposes a party" to it. *Id.* ¶ 40.

¶27 Though the circumstances at issue in *Orlando Millenia* and this case are similar, we acknowledge that the factual overlap is not perfect. After all, the Utah Supreme Court in *Orlando Millenia* allowed a lender to claim third-party beneficiary rights while suing an escrow agent, while we're considering whether an escrow agent can claim third-party beneficiary rights while defending itself from a suit by a purchaser. But what matters most for our purposes are the legal principles. On that front, *Orlando Millenia*'s approach to the third-party beneficiary dynamic seems consistent with the Colorado approach we outlined above, and we think *Orlando Millenia* functions as a useful illustration of how those principles operate in a scenario that resembles this one in certain key respects. Like the lender in the *Orlando Millenia* transaction, First American was "expressly named" in the contracts in question, and those contracts (i.e., the PSAs) also required "specific actions" from First American before they could be completed. *Id.* ¶ 38. First American was therefore "no mere incidental beneficiary" to the contracts at issue. *Id.* ¶ 40.

¶28 We also note that Purchasers' claims against First American are all linked in some measure to the underlying real estate transactions. Those transactions were governed by the PSAs, Purchasers signed those PSAs, and the PSAs all contained an arbitration clause. In another recent Utah case that we think the Colorado courts would find persuasive, this court relied on

Delaware law when holding that a signatory plaintiff was subject to a forum selection clause in a suit it filed against certain non-signatories to a contract. *Volonte v. Domo, Inc.*, 2023 UT App 25, 528 P.3d 327. Of note, the plaintiff had alleged that the non-signatories had "acted as financial advisors for and assisted in the preparation and dissemination of" allegedly "false and misleading" statements from the contract. *Id.* ¶ 6 (quotation simplified). Because that contract contained a forum selection clause, we rejected the plaintiff's attempt to avoid the forum selection clause when suing non-signatories for closely related conduct, holding that a contrary ruling would improperly give the plaintiff an "end-run around" a provision from a contract to which the plaintiff was a party. *Id.* ¶ 87 (quotation simplified). Yet this same kind of attempted end-run is essentially what Purchasers are attempting in this case too.

¶29 Even so, we recognize that this presents a somewhat unique factual and procedural scenario for which no Colorado case seems directly on point. But if any doubt remains, we're convinced that under Colorado law, that doubt would be resolved in favor of concluding that the arbitration clause applies. The "preferred method of dispute resolution in Colorado" is "arbitration." *N.A. Rugby Union LLC*, 2019 CO 56, ¶ 19; *see also Herrera v. Santangelo Law Offices, PC*, 2022 COA 93, ¶ 11, 520 P.3d 698 ("Colorado law favors the resolution of disputes through arbitration." (quotation simplified)); *Johnson-Linzy v. Conifer Care Cmtys. A, LLC*, 2020 COA 88, ¶ 16, 469 P.3d 537 ("Colorado's preference for the resolution of disputes through arbitration is embedded in both the Colorado Constitution and the [Colorado Uniform Arbitration Act]."). In light of this preference, Colorado courts will "[i]n general . . . resolve ambiguities in favor of arbitration." *N.A. Rugby Union LLC*, 2019 CO 56, ¶ 19; *see also Radil v. National Union Fire Ins. Co. of Pittsburgh, PA*, 233 P.3d 688, 692 (Colo. 2010) ("We resolve ambiguities in favor of arbitration . . . ."); *Lane v. Urgitus*, 145 P.3d 672, 678 (Colo. 2006) (holding that if "ambiguities are found in the

arbitration agreement," Colorado courts apply "a presumption in favor of arbitration and resolve doubts about the scope of the arbitration clause in favor of arbitration").[5]

¶30　In short, the parties have pointed to no case in which a Colorado court considered the question of whether an escrow

---

5. Purchasers suggest that this preference should not apply here because of cases holding that ambiguities in an insurance contract are construed against the insurer (which, in this case, would be First American). But the Colorado cases that Purchasers rely on for this proposition are about coverage disputes. *See, e.g., Renfandt v. New York Life Ins. Co.*, 2018 CO 49, ¶¶ 17–18, 419 P.3d 576; *GEICO Cas. Co. v. Collins*, 2016 COA 30M, ¶¶ 18–19, 371 P.3d 729; *Public Service Co. of Colorado v. Wallis & Companies*, 986 P.2d 924, 931 (Colo. 1999). And both things can be true—i.e., courts can construe ambiguities regarding coverage in favor of the insured, while then construing any ambiguities about the applicability of an arbitration clause in a covered case in favor of arbitration. In one case, for example, the Colorado Supreme Court applied both the "policy against dilution of the uninsured motorist coverage" *and* the "policy in favor of encouraging arbitration as an alternative to litigation" within the same case. *Huizar v. Allstate Ins. Co.*, 952 P.2d 342, 345–47 (Colo. 1998).

In any event, the Colorado Supreme Court has held that if these two principles come into conflict, the preference for arbitration wins out. *See Allen v. Pacheco*, 71 P.3d 375, 378 n.3 (Colo. 2003) ("Although the court of appeals correctly stated that ambiguities in an insurance contract generally are construed against the drafter, the court of appeals failed to recognize this court's clear holding in [*City & County of Denver v. District Court*, 939 P.2d 1353, 1364 (Colo. 1997)], that courts must afford ambiguities in arbitration agreements a presumption in favor of arbitration." (quotation simplified)). So here, if there is somehow a conflict between the two principles, Colorado's preference for arbitration would be the rule that would guide our decision.

agent can invoke third-party beneficiary rights to enforce an arbitration clause from a real estate contract. Considering this question ourselves, we note that the escrow agent was directly identified and brought into the real estate contracts at issue, the claims against the escrow agent are largely linked to those real estate transactions, and the real estate contracts all contain an arbitration clause. Under settled principles of Colorado law and backed by persuasive out-of-state authority, we believe that the escrow agent in these circumstances can qualify as a third-party beneficiary.[6]

---

6. In their complaint, Purchasers alleged that Kirsten Parkin was employed by First American and "act[ed]" as its "authorized agent" at "all relevant times." In their brief on appeal, Purchasers "agree[d] with" First American's position that Parkin is First American's "agent."

 As indicated above, the Appellants' brief was filed on behalf of both First American and Parkin. At the outset, the brief made it clear that its arguments applied to both First American and Parkin, asserting that the company and Parkin were asking us "together" to reverse the district court's order denying their joint motion to compel arbitration. Of note, this joint approach on appeal included the third-party beneficiary argument. In the Introduction, the brief argued that the district court had erred by failing to recognize that "they"—meaning First American and Parkin—"are third-party beneficiaries of the PSAs." In the substantive portion of the brief addressing the third-party beneficiary issue, the brief repeatedly argued that the "Appellants"—with the plural form again signifying inclusion of Parkin—were entitled to relief on that basis.

 Though somewhat unclear, Purchasers' responsive brief arguably drew a distinction between First American and Parkin with respect to Parkin's potential ability to rely on the arbitration clause from the Insurance Policy. With respect to the third-party

(continued…)

CONCLUSION

¶31    For the foregoing reasons, we hold that First American can invoke the arbitration clause from the PSAs. We accordingly reverse the district court's denial of First American's motion to compel arbitration.

————————

beneficiary issue, however, Purchasers drew no such distinction. While Purchasers broadly disagreed with the assertion that the third-party beneficiary rule applied to this case, Purchasers made no effort to distinguish Parkin on this front—i.e., Purchasers never argued that even if the PSAs intended to confer a benefit on First American, there was a meaningful difference with respect to any intent to confer a benefit on First American's agents generally or Parkin more particularly. Given the posture of this case and the way that it was briefed, we therefore conclude that, like First American, Parkin is entitled to relief under the third-party beneficiary rule.